UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


4 ACES ENTERPRISES, LLC, ET AL.                    CIVIL ACTION

v.                                                 NO. 20-2150

JOHN BEL EDWARDS, ET AL.                           SECTION "F"


ORDER AND REASONS

Before the Court is the motion of ten Louisiana bar owners to enjoin Louisiana Governor John Bel Edwards and Louisiana State Fire Marshal H. "Butch" Browning Jr. from enforcing orders banning the on-site consumption of food or drinks at "bars." The case turns on a classic who-decides question: As between democratically accountable state officials and a federal court, who decides what measures best protect Louisianans during a global pandemic? The answer is state officials. For the reasons that follow, the bar owners' motion is DENIED.[1]

---

[1] The Court sets out in this Order and Reasons its findings of fact and conclusions of law. See FED. R. CIV. P. 5 2(a)(1).

**Background**

This is an as-applied constitutional challenge to the enforcement of proclamations issued by Governor Edwards to slow the spread of COVID-19 in Louisiana. The proclamations ban the on-site consumption of food or drinks at "bars," a term the proclamations do not define. The plaintiffs are ten southeast Louisiana bar owners that have closed shop.[2] Business was bad before the proclamations. But afterwards? The odds of survival seem slim. To try to save their businesses, the bar owners sued to enjoin Governor Edwards and Fire Marshal Browning from enforcing the proclamations against them.[3]

The bar owners' request implicates the scope of state police power during a public health crisis. That power is broad. The Supreme Court sketched its scope over a century ago, in <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905). And <u>Jacobson</u>'s understanding

---

[2] The bar owners say that it is not "economically feasible" for them to offer to-go or curbside options only.

[3] The Court appreciates the limited scope of the bar owners' challenge. Theirs is not a request to hold the proclamations unconstitutional in all respects as to all Louisianans; it is far more limited. They seek only to enjoin the Governor and Fire Marshal from enforcing one part of the proclamations——the on-site consumption ban——against their bars. The "mask mandate" and ten-person-gathering limit are not at issue. Nor does this Order and Reasons purport to say anything about the merits of any challenges that may be brought by other Louisiana bar owners in other regions of the state.

endures, as the Fifth Circuit reminded us in In re Abbott, 954 F.3d 772 (5th Cir. 2020).

The police power outlined in Jacobson and Abbott precludes this Court from "second-guess[ing] the wisdom or efficacy" of measures taken by state officials in response to the COVID-19 pandemic. Abbott, 954 F.3d at 785. The Governor says that is precisely what the bar owners try to do here; of course, the bar owners disagree. Before turning to the facts, the Court emphasizes its limited role and the governing standard. The question is not whether Governor Edwards' proclamations are desirable as a policy matter; the bar owners, understandably, think not; it is whether those proclamations have "some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" Abbott, 954 F.3d at 784 (quoting Jacobson, 197 U.S. at 31). That is a tricky and arduous test.

*The Pandemic*

In mid-March, the World Health Organization declared COVID-19 a pandemic. See Tedros Adhanom Ghebreyesus, Director-General, World Health Organization, Opening Remarks on Media Briefing (Mar. 11, 2020). The WHO Director-General warned that the pandemic "is a crisis that will touch every sector——so every sector and every individual must be involved in the fight." Id. Indeed.

In the months that followed, experts determined "[t]he virus that causes COVID-19 is spreading very easily and sustainably between people." Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): How It Spreads (Aug. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. The virus "is thought to spread mainly from person-to-person." Id. For example, the virus may spread "between people who are in close contact with one another (within about 6 feet)" and "[t]hrough respiratory droplets produced when an infected person coughs, sneezes, or talks." Id.

COVID-19 has proved particularly deadly in the United States. This country has recorded over 5 million confirmed cases and over 160,000 deaths from COVID-19. Centers for Disease Control and Prevention, Cases, Data, and Surveillance (Aug. 7, 2020), https://www.cdc.gov/coronoavirus/2019-ncov/cases-updates/cases-in-us.html. Among the states, Louisiana has arguably fared poorly; it has recorded 128,746 infections and 4,089 deaths. Louisiana Department of Health, Louisiana Coronavirus Information (Aug. 7, 2020), https://ldh.la.gov/coronavirus.

One declaration followed another. On the same day the WHO Director-General declared COVID-19 a pandemic, Governor Edwards declared a "public health emergency" under the Louisiana Health Emergency Powers Act, LA. REV. STAT. § 29:766(A), "as a result of the imminent threat posed to Louisiana citizens by COVID-19." La. Exec. Dep't, Proclamation No. 25 JBE 2020, § 1 (Mar. 11, 2020).

Five days later, Governor Edwards issued a proclamation providing for "additional measures . . . necessary to protect the health and safety of the public." La. Exec. Dep't, Proclamation No. 30 JBE 2020 (Mar. 16, 2020). One measure was the closure of certain "non-essential businesses," like "casinos, video poker establishments, movie theaters, bars, bowling alleys, and fitness centers and gyms." Id. at § 2.

Less than a week later, Governor Edwards issued another proclamation. See La. Exec. Dep't, Proclamation No. 33 JBE 2020 (Mar. 22, 2020). This one ordered "individuals within the state ... to stay home unless performing an essential activity," id. at § 3, and "postponed or cancelled" "all gatherings of 10 people or more," id. at § 2.

Fast forward two months. It is mid-May, and Louisiana is "on track to meet the requirements to move safely into Phase 1 of recovery." La. Exec. Dep't, Proclamation No. 58 JBE 2020 (May 14,

2020). Governor Edwards issued a proclamation declaring that Louisiana would move into "Phase 1" of re-opening. Id. This "Phase 1 Order" provided for the "gradual re-opening" of the state, and it allowed bars with approved food-service permits to re-open at 25% capacity. Id. at § 2(G)(1).

Three weeks after issuing the Phase 1 Order, Governor Edwards issued a proclamation declaring that Louisiana would move into "Phase 2." La. Exec. Dep't, Proclamation No. 74 JBE 2020 (June 4, 2020). This "Phase 2 Order" allowed bars with approved food-service permits to re-open at 50% capacity. Id. at § 2(G)(1)(c). It allowed bars without approved food-service permits to re-open at 25% capacity. Id. at 2(G)(1)(d). But it warned that "it may be necessary to go back to the full restrictions" if Louisiana saw increases in cases or hospitalizations. Id. at p. 2.

Over the next month, Louisiana saw increases in both. And Governor Edwards' response is the focus of this litigation.

On July 11, Governor Edwards issued a proclamation providing for "additional [P]hase 2 mitigation measures." La. Exec. Dep't, Proclamation No. 89 JBE 2020.[4] One "mitigation measure" banned the on-site consumption of food or drinks at bars:

---

[4] Twenty-five Louisiana legislators filed an amicus brief contending that 89 JBE 2020 violates separation-of-powers principles under the Louisiana Constitution. Because the bar owners request injunctive relief, and this Court cannot enjoin

6

> No bar, with or without a food service permit from the
> Louisiana Department of Health, shall allow for on
> premises consumption of any food or drinks. However, any
> bar shall be allowed to provide for takeout through
> drive-thru or curbside delivery, including alcoholic
> beverages.

Id. at § 2.

To support these "mitigation measures," the proclamation cites "an alarming increase in the number of new COVID-19 positive tests, with increasing positivity rates, and hospitalizations," since the state moved into Phase 2. Id. at p. 2. The proclamation notes that "young adults aged 18-29 years and children under 18 account[ed] for the majority of new cases" since the state entered [P]hase 2." Id. And, of concern and significance, the proclamation attributes this age-group-specific increase to the "opening and expanding [of] sectors related to amusement, with at least 36 known outbreaks across the state occurring in bars." Id.

But 89 JBE 2020 leaves a basic question unanswered: What is a "bar"? Apparently, the Governor means to define "bar" by reference to the permitting requirements of the Louisiana Office of Alcohol and Tobacco Control. That agency provides for a "Class

---

Governor Edwards and Fire Marshal Browning to follow Louisiana law, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984), the legislators' argument is best made in a state court. See In re Abbott, 956 F.3d 696, 720–21 (5th Cir. 2020) ("[W]e caution that any relief ordering a state official to comply with state law would be barred by the Pennhurst doctrine.").

A-General" (AG) permit and a "Class A-Restaurant" (AR) permit. The distinction drives the bar owners' challenge.

The bar owners hold AG permits. See LA. REV. STAT. § 26:71.1(1)(a). By statute, AG permits are "issued only to retail outlet[s] where beverage alcohol is sold on the premises for consumption on the premises by paying customers." Id. And, subject to exceptions not relevant here, AG permits are issued only to "establishment[s] where the state law provides that no person under the age of eighteen years is allowed on the premises[.]" LA. REV. STAT. § 26:71.1(1)(d). According to a former Commissioner of the Louisiana Office of Alcohol and Tobacco Control, Murphy J. Painter, AG permits are issued to businesses if their average monthly revenue from the sale food and non-alcoholic beverages is 50% or less than their total monthly revenue from the sale of food, nonalcoholic beverages, and alcoholic beverages.

Most restaurants with bars hold AR permits. See LA. REV. STAT. § 26:71.1(2). AR permits are issued only to "restaurant establishment[s]" and "dinner theater[s]". Id. A "restaurant establishment" is a business that:

    (a)    *operates a place of business whose average monthly revenue from food and nonalcoholic beverages exceeds fifty percent of its total average monthly revenue from the sale of food, nonalcoholic beverages, and alcoholic beverages;*

    (b)    serves food on all days of operation;

> (c)　maintains　separate　sales　figures　for　alcoholic beverages;
>
> (d)　operates　a　fully　equipped　kitchen　used　for　the preparation　of　uncooked　foods　for　service　and consumption of such foods on the premises; and
>
> (e)　has　a　public　habitable　floor　area　of　no　less　than five hundred square feet dedicated to the exclusive use of the applicant's or licensee's business.

LA. REV. STAT. § 26:73(C)(1) (emphasis added). In the view of both sides, subsection (a) is the key criterion that distinguishes AG permitholders from AR permitholders: The percentage of revenue the business derives from food and nonalcoholic beverages. If that percentage exceeds 50%, the business is an AR permitholder and is not, for purposes of 89 JBE 2020, a "bar." If the percentage is less than 50%, the business is an AG permitholder and a "bar" subject to 89 JBE 2020's ban of on-site consumption.[5] All agree that this is not the neatest distinction; they depart on whether it is an unconstitutional one.

As noted, businesses with AG permits cannot allow minors on the premises. See LA. REV. STAT. § 26:71.1(1)(d). But businesses with AR permits, like restaurants with bars, can. See LA. REV. STAT. § 26:73. AR-permitted businesses can operate a full-service bar,

---

[5] It is unclear why the Governor failed to make so fundamental a distinction on the face of his proclamations. The omission deals a gratuitous blow to already-struggling small businesses, requiring them to guess whether they are subject to the on-premises-consumption ban or not.

9

as long as food is served at the bar. Blurring the line between "bar" and "restaurant," AG-permitted businesses——"bars"——can apply for a "conditional" AR permit, which allows them to operate like a restaurant with a full-service bar. To so qualify, an AG-permitted bar must meet the requirements of LA. REV. STAT. § 26:73(C)(1)(a)-(d) from 7:00 AM to 11:00 PM each day of operation. LA. REV. STAT. 26:71.1(4)(a).

The bottom line: Under 89 JBE 2020, AG-permitted businesses are "bars" that cannot allow on-site consumption of food and drinks; AR- and conditionally AR-permitted businesses are not "bars," even though they may operate full-service bars. Because they are not "bars," these AR-permitted businesses are not subject to 89 JBE 2020's ban of on-site consumption. The bar owners contend, persuasively, that this distinction is arbitrary because AG-permitted bars present the same COVID-19 transmission risks as AR-permitted restaurants with full-service bars and conditionally AR-permitted bars.

Three days after the Governor issued 89 JBE 2020, the White House released a report, tailored to Louisiana, recommending the closure of "bars and gyms in hot spot parishes." White House Coronavirus Task Force, Louisiana State Report (July 14, 2020). The report, like 89 JBE 2020, does not define "bars."

The next day, Louisiana Attorney General Jeffrey Martin Landry issued an opinion concluding that three provisions of 89 JBE 2020, including the ban of on-site consumption at bars, are "likely unconstitutional." La. Att'y Gen. Op. No. 20-0068, 2020 WL 4259217, at *7. (July 15, 2020). Attorney General Landry explained:

> The bar closure is also problematic for several reasons. First, the proclamation provides little data to support a statewide closure of a single type of business, without regard to whether the business is operating with the utmost care and a perfect record, operates exclusively with outdoor service, or operates in a geographical location with little data showing spikes related to bars. The proclamation vaguely refers to a handful of outbreaks traced to "bars" but does not say where those outbreaks occurred and does not place the minimal data in the context of the total number of facilities that qualify as a "bar." It also only vaguely connects outbreaks by stating they "may be" related to bars based on hearsay from contact tracing. Without stating adequate data to support it, the Governor has singled out one type of business and punished hundreds of law-abiding business owners.

Id. at *6. Attorney General Landry's thoughtful opinion is due respect, but it lacks the force of law and binds neither the Court nor the Governor. See Bay v. Jefferson Par. Pub. Sch., 2016-0890 (La. App. 4 Cir. 4/26/17); 218 So. 3d 207, 212 n.9 (citing Concrete

*Busters of La., Inc. v. Bd. of Comm'rs of the Port of New Orleans*, 2010-1172 (La. App. 4 Cir. 2/2/11); 69 So. 3d 484, 487-88).

Undeterred or unpersuaded by Attorney General Landry's opinion, Governor Edwards issued proclamations renewing the ban of on-site consumption at bars on July 23 and August 6. La. Exec. Dep't, Proclamation Nos. 96 JBE 2020 & 101 JBE 2020, § 2. The ban will expire on August 28, unless renewed. Id., 101 JBE 2020, § 6.

The latest Louisiana State Report notes that "Louisiana has seen a decrease in new cases and a decrease in testing positivity over the past week with evidence of an early impact of mitigation efforts." White House Coronavirus Task Force, Louisiana State Report (August 2, 2020). The report recommends that Louisiana "[c]ontinue the closure of establishments where social distancing and mask use cannot occur, such as bars." Id.

*This Litigation*

On July 30, twenty-two Louisiana bar owners sued Governor Edwards and Fire Marshal Browning, alleging that 89 JBE 2020, 96 JBE 2020, and 101 JBE 2020 are unconstitutional as applied to them. They say the proclamations are unconstitutional because they are under-inclusive: The proclamations fail to treat similarly businesses that present similar risks of COVID-19 transmission, like restaurants with bars, casinos with bars, and bars that have obtained conditional AR permits.

The bar owners take issue with the Governor's ban of on-site consumption of food and drinks at bars. They say that, because of that ban, "their livelihoods are being destroyed," and the Court does not doubt their sincerity. They contend, also, that the ban "targets" their bars and is unsupported in fact and in science. They say no COVID-19 case has been traced to any of their bars, and no evidence links bars, in general, to the spread of COVID-19. In this regard, they emphasize that only 454 cases——just 0.45% of total cases statewide——have been traced to bars. One hundred of those 454 cases, they add, stem from a notorious outbreak at "Tigerland," a strip of minor-frequented bars near the campus of Louisiana State University, on Memorial Day weekend. Considering the lack of scientific evidence linking bars to the spread of COVID-19, and the Governor's failure to impose similar restrictions on similarly situated business, such as restaurants with bars, the bar owners say the Governor's ban of on-site consumption at bars is flagrantly unconstitutional.

The bar owners sue for:

(1)  denial of substantive due process under the Fifth and Fourteenth Amendments to the U.S. Constitution;

(2)  denial of procedural due process under the Fifth and Fourteenth Amendments to the U.S. Constitution;

(3)  violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

(4)  unlawful takings, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution;

(5)  violations of due process and equal protection under the Louisiana Constitution;

(6)  unlawful takings, in violation of the Louisiana Constitution; and

(7) a declaratory judgment.

In count one of their complaint, the bar owners say the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 violates their rights to substantive due process under the Fourteenth Amendment to the U.S. Constitution. They say, incorrectly, that the Due Process Clause creates a "fundamental right to individual liberty, which includes the right to pursue a lawful occupation without undue government interference." For that proposition they invoke two Lochner-era decisions, Allgeyer v. Louisiana, 165 U.S. 578 (1897), and Meyer v. Nebraska, 262 U.S. 390 (1923). They say the ban of on-site consumption violates their allegedly fundamental rights because (1) the ban is "arbitrary" in that it is not supported by scientific data showing that members of the public are more likely to contract COVID-19 while at a bar than at another similarly situated business, like a casino with a bar or a restaurant with a full-service bar; and (2) the Governor has less restrictive means at his disposal, so a full-blown ban was unnecessary. The Governor could, for example, impose restrictions

based on bars that are "hot spots" or allow bars to remain open at reduced capacity.

In count two, the bar owners allege that the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 violate their rights to procedural due process under the Fourteenth Amendment to the U.S. Constitution. The bar owners invoke Mathews v. Eldridge, 424 U.S. 319 (1976), and insist that they were entitled to "notice and an opportunity to be heard" before the Governor began enforcing the proclamations.

In count three, the bar owners say the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 violates their rights to equal protection under the Fourteenth Amendment to the U.S. Constitution. They say the ban of on-site consumption at bars "singl[es] out their lawful business activities and subject[s] them to targeted enforcement without any rational or evidence-based reason." They reason that the ban is fatally underinclusive because it fails to reach businesses similarly situated, including "restaurants with bars" and "other businesses with gatherings of patrons."

In count four, the bar owners say the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 amounts to a taking without just compensation, in violation of the Fifth Amendment, as applied to

the states through the Fourteenth Amendment to the U.S. Constitution.

In count five, the bar owners say the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 violates their rights to due process and equal protection under the Louisiana Constitution.

In count six, the bar owners say the Governor's enforcement of 89 JBE 2020 and 96 JBE 2020 amounts to a taking without just compensation, in violation of Article I, § 4 of the Louisiana Constitution.

Finally, in count seven, the bar owners request a declaratory judgment that § 2 of 89 JBE 2020 violates their fundamental rights.

On July 30, the same day the bar owners filed this lawsuit, the bar owners moved for an order temporarily restraining Governor Edwards and Fire Marshal Browning from enforcing the on-site consumption ban against them. The Court denied the motion the next day. See 4 Aces Enterprises, LLC v. Edwards, No. CV 20-2150, 2020 WL 4432727, at *1 (E.D. La. July 31, 2020). The reason? The bar owners had not "clearly carried" their burden of showing that the requirements for obtaining this "extraordinary and drastic" remedy were met. See Anderson v. Jackson, 556 F.3d 351, 260 (5th Cir. 2009). In denying the motion, the Court emphasized that the purpose of a temporary restraining order is to preserve the status quo; because the challenged proclamations had taken effect, the status

16

quo favored the Governor and the Fire Marshal. See Granny Goose
Foods v. Bd. of Teamsters & Auto Truck Drivers, 415 U.S. 424, 439
(1974) (noting that *ex parte* temporary restraining orders "should
be restricted to serving their underlying purpose of preserving
the status quo").

On August 6, thirteen of the twenty-two bar owners voluntarily
dismissed their claims, without prejudice, under Federal Rule of
Civil Procedure 41(a)(1)(A)(i).

Later that day, and in light of the voluntary dismissal, the
bar owners amended their complaint to add ten plaintiffs. According
to the amended complaint, the plaintiffs are:

1. Big Tyme Investments, LLC, d/b/a Big Daddy's Pub & Grub,
   an AG-permitted business established in March 2005 and
   based in Houma, Louisiana.

2. CD Enterprises of Houma LLC, d/b/a Larussa's Lounge, an
   AG-permitted business established on the eve of the
   pandemic, in March 2020, and based in Houma, Louisiana.

3. JOM LLC, d/b/a Just One More, an AG-permitted business
   established in August 2015 and based in Houma,
   Louisiana.

4. LongShotz 1, LLC, d/b/a Longshotz, an AG-permitted business established in December 2013 and based in Houma, Louisiana.

5. Paradise Sports Bar & Daiquiris, LLC, d/b/a Epic Lounge, an AG-permitted business established in February 2006 and based in Marrero, Louisiana.

6. R & J Lapeyrouse, LLC, d/b/a Jeaux's New Horizon, an AG-permitted business established in March 2018 and based in Houma, Louisiana.

7. R. Heasley, LLC, d/b/a Ram Rod's Saloon, an AG-permitted business established in June 2012 and based in Houma, Louisiana.

8. Tap Dat, L.L.C., d/b/a the Brass Monkey, an AG-permitted business established in October 2016 and based in Slidell, Louisiana.

9. The Music Cove, LLC, an AG-permitted business established in June 2013 and based in Houma, Louisiana.

10. The Outer Limits Bar, LLC, an AG-permitted business established in November 2014 and based in Houma, Louisiana.

Now, these bar owners move to enjoin Governor Edwards and Fire Marshal Browning from enforcing the ban on on-site consumption

against them.[6] The Court *sua sponte* converted the bar owners'
motion for preliminary injunctive relief into a motion for
preliminary and permanent injunctive relief; the parties had ten
full days' notice of the conversion. See <u>Univ. of Texas v.
Camenisch</u>, 451 U.S. 390, 395 (1981); <u>Cf.</u> <u>Nationwide Amusements,
Inc. v. Nattin</u>, 452 F.2d 651, 562 (5th Cir. 1971).

The Court held a preliminary and permanent injunction hearing
by videoconference on August 14.[7] Counsel presented argument, and
Dr. Alexander Billioux, Assistant Secretary of the Office of Public
Health of the Louisiana Department of Health, testified. Both sides
agreed that the Court must consider the bar owners' challenge under
the <u>Jacobson</u>/<u>Abbott</u> framework. The bar owners stressed that their
strongest arguments sound in equal protection: The ban of on-site

---

[6] The bar owners do not ask for injunctive relief on their
claims under the Louisiana Constitution (counts five and six) for
an obvious reason: <u>Pennhurst</u> bars the Court from enjoining Governor
Edwards and Fire Marshal Browning to follow Louisiana law. See <u>In
re Abbott</u>, 956 F.3d 696, 720–21 (5th Cir. 2020).

[7] The Court recognized the time-sensitive nature of the bar
owners' request and credited the bar owners' contention that they
lose significant revenue each day their bars are banned from
allowing on-site consumption of food or drinks. These
considerations caused the Court to limit the presentations to one
hour per side. No party objected. And for good reason: This Court
"has inherent power 'to control the disposition of the causes on
its docket with economy of time and effort for itself, for counsel,
and for litigants.'" <u>United States v. Colomb</u>, 419 F.3d 292, 299
(5th Cir. 2005) (quoting <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 254
(1936)).

consumption at "bars" singles out AG-permitted bars for disfavored treatment, they insist. To prove differential treatment, the bar owners underscored that the ban exempts businesses, like restaurants with bars, that pose similar risks of COVID-19 spread. The Governor fought that premise. Bars are riskier than restaurants with bars, he contended, looking to Dr. Billioux for support. After the hearing concluded, the Court informed the parties that it would take the motion under advisement and enter a written ruling as soon as possible. That ruling follows.

I.

The Court starts with the standards for preliminary and permanent injunctive relief. Those standards are "'essentially the same.'" Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 32 (2008) (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987)).

To obtain a preliminary injunction, the bar owners "'must show (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" Realogy Holdings Corp. v. Jongebloed, 957 F.3d 523, 529–30 (5th Cir. 2020) (quoting Brock Servs., L.L.C. v. Rogillio, 936 F.3d 290, 296 (5th Cir. 2019)).

To obtain a permanent injunction, the bar owners "must show (1) success on the merits; (2) the failure to grant the injunction will result in irreparable injury; (3) the injury outweighs any damage that the injunction will cause the opposing party; and (4) the injunction will not disserve the public interest. United Motorcoach Ass'n, Inc. v. City of Austin, 851 F.3d 489, 492-93 (5th Cir. 2017) (citing VRC LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006)).

## II.

And now, the merits. The bar owners move to enjoin Governor Edwards and Fire Marshal Browning from enforcing the ban on on-site consumption against them. They contend, with some force, that the ban violates their rights under the Due Process and Equal Protection Clauses of the U.S. Constitution.[8] The Governor and Fire Marshal obviously disagree. They rejoin that the ban is a permissible public-health measure under Jacobson and Abbott. The contentions of these state officials lean heavily, if not

---

[8] The Court notes with interest that the bar owners sued as businesses and not as individuals. Consequently, the bar owners are not "citizens" and cannot claim protection under the Fourteenth Amendment's Privileges or Immunities Clause. See Hemphill v. Orloff, 277 U.S. 537, 550 (1928). As originally understood, that clause arguably affords the individual bar owners greater protection, for it protects all civil rights, "fundamental" or not. See, e.g., John Harrison, Reconstructing the Privileges or Immunities Clause, 101 YALE L.J. 1385, 1414-16 (1992).

exclusively, on the deference they are due under <u>Jacobson</u> and <u>Abbott</u>.

A.

To satisfy the first requirement for obtaining permanent injunctive relief, the bar owners must show "success on the merits." <u>United Motorcoach</u>, 851 F.3d at 492. "Success" is viewed through the lens of the substantive law——here, the Due Process and Equal Protection Clauses of the United States Constitution. <u>See</u> <u>Valley v. Rapides Par. Sch. Bd.</u>, 118 F.3d 1047, 1051 (5th Cir. 1997). The bar owners contend the Governor's executive proclamations violate both provisions. The Court must evaluate the bar owners' challenges under the rigorous <u>Jacobson</u>/<u>Abbott</u> standard. <u>See</u> <u>Abbott</u>, 954 F.3d at 786 ("<u>Jacobson</u> instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency.") (emphasis in original).

Traditional doctrine does not control during a pandemic; <u>Jacobson</u> does.[9] <u>See</u> <u>Abbott</u>, 954 F.3d at 778 (citing <u>Jacobson</u>, 197

---

[9] The Court recognizes that three Justices of the Supreme Court and several U.S. Circuit Judges have questioned whether <u>Jacobson</u> supplies the standard for assessing all constitutional challenges to public-health measures. <u>See</u> <u>Calvary Chapel Dayton Valley v. Sisolak</u>, --- S. Ct. ---, 2020 WL 4251360, at *6 (July 24, 2020) (Alito, J., joined by Thomas and Kavanaugh, J.J., dissenting from denial of application for injunctive relief); <u>S. Bay United Pentecostal Church v. Newsom</u>, 959 F.3d 938, 942 (9th Cir. 2020) (Collins, J., dissenting) (questioning <u>Jacobson</u>'s

U.S. at 25); S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (Mem.).[10]

In Jacobson, the Supreme Court rejected a Fourteenth Amendment challenge to a compulsory vaccination law enacted during a smallpox epidemic. Jacobson, 197 U.S. at 26. The Court said that a community enjoys the right "to protect itself against an epidemic of disease which threatens the safety of its members." Id.; see also Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) (constitutional rights do "not include liberty to expose the community . . . to communicable disease"). The "pressure of great danger[]," like a global pandemic, justifies the reasonable restriction of constitutional rights "as the safety of the general public may demand." Jacobson, 197 U.S. at 26.; see also United States v. Salerno, 481 U.S. 739, 748 (1987) ("We have repeatedly held that the Government's regulatory interest in community safety

---

scope); Spell v. Edwards, 962 F.3d 175, 181 (5th Cir. 2020) (Ho, J., concurring) (same); but see Abbott, 954 F.3d at 778 n.1 ("Jacobson governs a state's emergency restriction of any individual right[.]") (emphasis in original).

[10] Of course, "[w]e do not suspend the Constitution during a pandemic." Texas Democratic Party v. Abbott, 961 F.3d 389, 413 (5th Cir. 2020) (Ho, J., concurring). But we do give greater deference to state exercises of police power. See S. Bay United Pentecostal Church, 140 S. Ct. at 1614; Texas Democratic Party, 961 F.3d at 393-94.

can, in appropriate circumstances, outweigh an individual's liberty interest."). In a public-health emergency, judicial review is appropriate only

> if a statute[11] purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.*

Id. at 31 (emphasis added).

A century has passed, but Jacobson, the Fifth Circuit instructs, "remains good law." Abbott, 954 F.3d at 785. Just three months ago, the Fifth Circuit mandamused a district court for failing to apply Jacobson in a substantive-due-process challenge to an executive order postponing non-essential surgeries, including abortions. Abbott, 954 F.3d at 779; see also Texas Democratic Party, 961 F.3d at 394 (staying injunction, invoking

---

[11] As Judge Chin has observed, Jacobson's reasoning is not limited to statutes; it embraces "any governmental restriction on individual rights taken ostensibly to protect public health and safety." Liberian Cmty. Ass'n of Connecticut v. Lamont, No. 17-1558, --- F.3d ---, 2020 WL 4723015, at *15 (2d Cir. Aug. 14, 2020) (Chin, J., concurring in part and dissenting in part). Here, there is no dispute that 89 JBE 2020 is a liberty-limiting public-health restriction subject to the Jacobson analysis. See, e.g., Elim Romanian Pentecostal Church v. Pritzker, No. 20-1811, 2020 WL 2517093, at *1 (7th Cir. May 16, 2020) (denying motion to enjoin an executive order of Illinois Governor Jay Pritzker pending appeal, citing Jacobson).

<u>Jacobson</u>, and admonishing district court for "taking matters into his own hands"). <u>Abbott</u>'s central holding is clear:

> When faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."

<u>Id.</u> at 784 (quoting <u>Jacobson</u>, 197 U.S. at 31). Under this framework, a court "may ask whether the state's emergency measures lack basic exceptions for 'extreme cases,' and whether the measures are pretextual——that is, arbitrary or oppressive." <u>Abbott</u>, 954 F.3d at 785. But a court "may not second-guess the wisdom or efficacy of the measures." <u>Id.</u> Ultimately, "if the choice is between two reasonable responses to a public crisis, the judgment must be left to the governing state authorities." <u>Id.</u> at 792. When a state official acts during a pandemic, in an area "'fraught with medical and scientific uncertaint[y],'" his latitude "'must be especially broad.'" <u>S. Bay United Pentecostal Church</u>, 140 S. Ct. at 1613 (quoting <u>Marshall v. United States</u>, 414 U.S. 417, 427 (1974)).

To their credit, the bar owners acknowledge the <u>Jacobson</u>/<u>Abbott</u> standard and insist they can meet it. The Court's analysis proceeds in two steps. The Court first decides if the proclamations infringe the bar owners' constitutional rights. If

they do not, the analysis ends; the bar owners lose. If they do, the Court moves to the second step and asks whether the infringement is justified because of a "'real and substantial relation'" between the proclamations and slowing the spread of COVID-19. Abbott, 954 F.3d at 784 (quoting Jacobson, 197 U.S. at 31). On to step one.

1.

At the first step of the Jacobson/Abbott analysis, the bar owners must identify a constitutional right the Governor's proclamations infringe. They raise three rights: substantive due process, procedural due process, and equal protection. The Court considers each in turn.

*Substantive Due Process*

The bar owners contend the executive proclamations violate their "substantive due process"[12] rights to run lawful businesses. The Due Process Clause says that "[n]o State shall . . . deprive

---

[12] The Due Process Clause is about "process." The notion that a provision "that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words." McDonald v. City of Chicago, 561 U.S. 742, 811 (Thomas, J., concurring). But substantive due process is the law, and the Court will follow it. See James v. City of Boise, 136 S. Ct. 685, 686 (2016).

any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Supreme Court has interpreted this clause to include a "substantive" component, which "forbids the government [from] infring[ing] certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993).

The substantive-due-process analysis has two "primary features." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). The first is that the Due Process Clause protects only "those fundamental rights and liberties [that] are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id. at 720-21 (citation omitted). The second is that "the Supreme Court requires a 'careful description' of the asserted fundamental liberty interest." Id. at 721; see Kerry v. Din, 576 U.S. 86, 93 (2015).

The bar owners say the Governor's proclamations deprive them of substantive due process in two ways.

First, they contend the Governor's proclamations "curtail" their "fundamental right" to operate a lawful business.[13] Abbott,

---

[13] So any equal-protection analysis would require the Governor's proclamations to survive only rational-basis review. As

954 F.3d at 784. They invoke <u>Allgeyer v. Louisiana</u>, 165 U.S. 578 (1897), and insist they enjoy a constitutional right to earn a "livelihood by any lawful calling."[14] No so. <u>Allgeyer</u> is a <u>Lochner</u>-era freedom-of-contract case; it does not establish a fundamental right to run a business. <u>See</u> 165 U.S. at 578. And even if it did, the Supreme Court long ago repudiated the <u>Allgeyer</u> line of cases. <u>See</u> <u>Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.</u>, 335 U.S. 525, 535-36 (1949). As has the Fifth Circuit. <u>See</u> <u>Pollard v. Cockrell</u>, 578 F.2d 1002, 1012 (5th Cir. 1978) (rejecting the "notion" of a fundamental "right to pursue a legitimate business"); <u>see also</u> <u>In re Premier Auto. Servs., Inc.</u>, 492 F.3d 274, 283 (4th Cir. 2007) (rejecting a fundamental "right to do business").

Next, the bar owners contend the Governor's proclamations infringe their constitutionally protected property interests in the profits of their businesses. This is a closer call. Outside the substantive-due-process context, the Supreme Court has said the "activity of doing business, or the activity of making a profit is not property in the ordinary sense[.]" <u>College Sav. Bank v.</u>

---

noted, however, it is the <u>Jacobson</u> framework, not the traditional tiers-of-scrutiny analysis, that controls.

[14] During this pandemic, the district courts that have considered the question whether the right to run a business is constitutionally protected agree——it is not. <u>See</u>, <u>e.g.</u>, <u>Xponential Fitness v. Arizona</u>, No. 20-CV-1310, 2020 WL 3971908, at *6 (D. Ariz. July 14, 2020); <u>Talleywhacker, Inc. v. Cooper</u>, --- F.3d --, 2020 WL 3051207, at *9 (E.D. N.C. June 8, 2020).

Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 676 (1999).

But this Circuit, in the substantive-due-process context, has said otherwise. See San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697, 701 (5th Cir. 1991). Unfortunately, Kacal is a per curiam, summary calendar, pre-College Sav. Bank decision; the panel concluded——without much analysis——that an arcade owner's "property interest in the profits of her business and her liberty interest in operating her business do rise to the level of protectible interests." Kacal, 928 F.2d at 704 (citing Phillips v. Vandygriff, 711 F.2d 1217, 1222 (5th Cir. 1983), on reh'g in part, 724 F.2d 490 (5th Cir. 1984)).

Kacal has caused considerable confusion. See, e.g., Stidham v. Tex. Comm'n on Private Sec., 418 F.3d 486, 492 n.9 (5th Cir. 2005) ("[I]t is unclear in Kacal whether lost profits were considered a protected property interest or only a measure of damage."). Still, in a post-College Sav. Bank opinion, the Fifth Circuit cited Kacal for the proposition that a business owner has a Fourteenth Amendment right to "operat[e] a legitimate business, free from deprivation by local police acting under color of state law." Doss v. Morris, 642 F. App'x 443, 447 (5th Cir. 2016) (per curiam) (citation omitted). So the Court considers itself bound by Kacal and is compelled to conclude, no matter how shaky that

decision's foundation, that the bar owners have a constitutionally protected property interest in the profits of their businesses.

*Procedural Due Process*

The bar owners next contend the Governor's proclamations violate their rights to procedural due process. See U.S. CONST. amend. XIV, § 1. Procedural due process constrains government decisions that deprive constitutionally protected "liberty' or "property" interests. Mathews v. Eldridge, 424 U.S. 319, 332 (1976). Because the Governor's proclamations deprive the bar owners of constitutionally protected property interests under Kacal, the bar owners enjoy a right "to be heard at a meaningful time and in a meaningful manner." Id. at 333.

Procedural due process "is not a technical conception with a fixed content unrelated to time, place[,] and circumstances." Id. at 334. It is "flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

"In most cases, 'a meaningful time' means prior to the deprivation of the liberty or property right at issue." Bowlby v. City of Aberdeen, 681 F.3d 215, 220 (5th Cir. 2012) (quoting Zinermon v. Burch, 494 U.S. 113, 127 (1990)). But "when the State must act quickly or pre-deprivation process is impractical, and

meaningful post-deprivation process is available, then due process is still satisfied." Bowlby, 681 F.3d at 200 n.1.

Here, it is undisputed that the bar owners received no pre-deprivation process——no hearing, no discussion, no opportunity to offer input. But such process was not required: The COVID-19 pandemic demanded that Governor Edwards take swift action to slow the virus' spread. See Gilbert v. Homar, 520 U.S. 924, 931 (1997). It would be "impractical," Bowlby, 681 F.3d at 200 n.1, to require pre-deprivation process in these circumstances, where "local officials are actively shaping their response to changing facts on the ground." S. Bay United Pentecostal Church, 140 S. Ct. at 1614.

Post-deprivation process has not been briefed or argued with any specificity. Because it does not affect the result or analysis, the Court assumes, without deciding, that the bar owners enjoy the right to meaningful post-deprivation process in this context.

*Equal Protection*

The bar owners contend the Governor's proclamations violate the Equal Protection Clause by targeting a single industry for disfavored treatment. The Equal Protection Clause says that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

The bar owners' challenge is of the class-of-one variety. In this regard, the bar owners say they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Integrity Collision Ctr. v. City of Fulshear, 837 F.3d 581, 586 (5th Cir. 2016) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). They say the Governor has, without rational basis, banned on-site consumption at bars (AG permit-holders) but not at similarly situated establishments, like restaurants with bars (AR and Conditional AR permit-holders). So the Court finds that the bar owners have identified an equal-protection right the Governor's proclamations allegedly infringe.

*   *   *

To sum up step one: The bar owners have identified a constitutional right the Governor's ban of on-site consumption allegedly infringes. Step one resolved, the Court turns to step two. The step-two question is whether these infringements are justified during this COVID-19 pandemic under the Abbott/Jacobson standard. They are——but barely so.

2.

The bar owners contend the Governor's proclamations flunk the onerous Jacobson/Abbott standard. To win, the bar owners must show that the ban of on-site consumption at bars has no "'real or

substantial relation' to the public health crisis" or that the proclamations are "'beyond all question, a plain, palpable invasion'" of their constitutional rights. Abbott, 954 F.3d at 784 (quoting Jacobson, 197 U.S. at 31). The Court finds that the bar owners do not on this record make that showing under the demands of Jacobson and Abbott.

The evidence adduced at the injunction hearing compels the Court to conclude that the Governor's ban of on-site consumption at bars has a "real or substantial relation" to slowing the spread of COVID-19. Yes, it is a close call, and the bar owners make a strong case.[15] To understand why the Court must nonetheless find against them, consider the testimony of Dr. Alexander Billioux, Assistant Secretary of the Louisiana Office of Public Health.

Dr. Billioux testified that, in his professional medical opinion, bars present a greater risk of COVID-19 transmission than do restaurants with bars. The "primary purpose" of bargoers is to socialize, Dr. Billioux said. Not so with restaurant-goers, who generally sit at a table with one group and whose "primary purpose" is eating a meal. Bars are also riskier than restaurants with bars, Dr. Billioux explained, because bars are generally louder, requiring their patrons to "move closer to each other" and

---

[15] The Court commends counsel for both sides for the quality of their briefing.

increasing the risk of viral spread. And the obvious point: Bargoers are more likely to drink alcohol than are visitors to restaurants with bars, and the intoxicated are less likely to maintain appropriate social distance and to wear masks.

Dr. Billioux also clarified the math. The Louisiana Department of Health, he explained, has located the source of COVID-19 exposure, through contact tracing, for only 2,212 cases[16]; 464 of those cases——20.9%——have been traced to bars. And, given the limits of contact tracing, the actual number of cases attributable to bars is probably much higher. So it is a bit misleading to say, as the bar owners do, that only 0.45% of Louisiana COVID-19 cases are traceable to bars.

These contact tracing figures appreciate the difference between bars and restaurants with bars, Dr. Billioux said. That is because, according to Dr. Billioux, contact tracers press COVID-19 carriers to provide the details of their exposure. Consider an example. A contact tracer calls a COVID-19 carrier who says he visited Walk On's, a restaurant with a bar, last week. The contact tracer's job is not done; he does not simply add a tally to the "restaurant" ledger on the Louisiana Department of Health's case counter. Instead, he probes further——he asks, for example, whether the patient sat at a table or at the bar. If the patient says he

---

[16] Not a confidence-inspiring performance.

sat at a table in the restaurant area, the infection is traced to a "restaurant." If the patient says he sat in the bar area, the infection is traced to a "bar." So the contact tracing data does not elide altogether the distinction between bars and restaurants with bars, as the bar owners contend.

Timing, too, drove the decision-making. Dr. Billioux said he recommended that the Governor ban on-site consumption at bars in early July, in response to the spike in cases and hospitalizations Louisiana experienced after moving into Phase 2. At the time of the decision, the Louisiana Department of Health had linked bars to 36 "clusters" (25% of all identified clusters) and 405 cases (26% of all identified cases).

The White House also backed the ban. A July 14 Louisiana State Report, issued by the White House Coronavirus Task Force, validated the decision the Governor made just three days earlier. The report recommended the closure of "bars and gyms in hot spot parishes." White House Coronavirus Task Force, Louisiana State Report (July 14, 2020). And, in another report, issued a few weeks later, the Task Force cited decreasing cases and testing positivity as "evidence" of the "early impact" of the Governor's "mitigation measures," including the ban on on-site consumption. White House Coronavirus Task Force, Louisiana State Report (August 2, 2020).

Considering Dr. Billioux's testimony and professional medical opinion, the contact tracing data, and the recommendations of the White House Coronavirus Task Force, the Court finds that banning on-site consumption of food or drinks at bars bears "at least some 'real or substantial relation' to the public health crisis and [is] not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" Abbott, 954 F.3d at 784 (quoting Jacobson, 197 U.S. at 31).

The bar owners cannot overcome the deference due state officials during this pandemic. It is Jacobson and Abbott's high bar that requires this result. Make no mistake: The Governor's victory does not mean his proclamations are sound policy; nor does it mean the proclamations are sufficiently solicitous of the interests of Louisiana small-business owners, like the plaintiffs here; it means quite simply that the proclamations are constitutional. See S. Bay United Pentecostal Church, 140 S. Ct. at 1614 (When the "broad limits" of state police power during a public health crisis "are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary[.]").

Though they cannot clear Jacobson and Abbott's high bar, the bar owners make reasonable arguments that merit mention. Chief among them is that the ban of on-site consumption fails under Jacobson/Abbott because it is underinclusive; it does not reach

other businesses that pose equal or greater risks of COVID-19 transmission. But the argument misunderstands the governing standard.

Jacobson and Abbott do not require state officials to draw perfect distinctions. See Abbott, 954 F.3d at 792. To be sure, the distinctions the Governor has drawn in JBE 89 2020 leave much to be desired. But what the bar owners want is a ban more nuanced than the law requires. Governor Edwards had to draw the line somewhere, and he chose the distinction——which predates the pandemic——between AG- and AR-permitted businesses.[17] That does not make his decision "irrational" or "arbitrary." See Heller v. Doe by Doe, 509 U.S. 312, 321 (1993). And, critically, there is no evidence that Governor Edwards "exploited the present crisis as a pretext to target" AG-permitted bars. Jacobson, 954 F.3d at 792 (citing Lawton v. Steele, 152 U.S. 133, 137 (1894)).

*    *    *

The bar owners cannot succeed on the merits of their claim that the Governor's enforcement of the ban of on-site consumption

---

[17] For example, the Sixth Circuit has recognized that "shaping the precise contours of public health measures entails some difficult line-drawing," and the Constitution "leaves that task to officials directly accountable to the people." League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer, No. 20-1581, --- F. App'x ---, 2020 WL 3468281, at *3 (6th Cir. June 24, 2020).

of food or drinks at "bars" violates their constitutional rights under the demanding Jacobson/Abbott standard. Because the bar owners cannot succeed on the merits, they cannot obtain an injunction. See Boerschig v. Trans-Pecos Pipeline, L.L.C., 872 F.3d 701, 706 (5th Cir. 2017).

### III.

On this record, the Court is compelled to conclude that Governor Edwards' ban of on-site consumption of food or drinks at "bars" bears a "real or substantial relation" to the goal of slowing the spread of COVID-19 and is not "beyond all question" a violation of the bar owners' constitutional rights. It is a permissible public-health measure under Jacobson and Abbott, and the Court is denied the discretion to second-guess it.

Accordingly, IT IS ORDERED: that the bar owners' motion for preliminary and permanent injunctive relief is DENIED. All pending motions are DENIED as moot.

New Orleans, Louisiana, August 17, 2020

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE