1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4   4 ACES ENTERPRISES, LLC, et al.     *      20-CV-2150
                                        *
5   versus                             *      Section F
                                        *
6   GOVERNOR JOHN BEL EDWARDS, et al.   *      August 14, 2020
                                        *
7   * * * * * * * * * * * * * * * * * * *

8

9                 INJUNCTION HEARING BEFORE
            THE HONORABLE MARTIN L.C. FELDMAN
10                UNITED STATES DISTRICT JUDGE

11

12  Appearances:

13

14  For the Plaintiffs:        Faircloth Melton Sobel & Bash, LLC
                               BY:  JIMMY R. FAIRCLOTH JR., ESQ.
15                                  MARY KATHERINE PRICE, ESQ.
                                    RICHARD F. NOREM III, ESQ.
16                             105 Yorktown Drive
                               Alexandria, Louisiana 71303

17

    For the Defendants:        Sher Garner Cahill Richter
18                               Klein & Hilbert, LLC
                               BY:  JAMES M. GARNER, ESQ.
19                                  CHRISTOPHER CHOCHELES, ESQ.
                                    JOSHUA S. FORCE, ESQ.
20                             909 Poydras Street, 28th Floor
                               New Orleans, Louisiana 70112

21

22  For the Defendants:        JACK M. WEISS, ESQ.
                               5938 Laurel Street
23                             New Orleans, Louisiana 70115

24

25

1 <u>Appearances</u>:

2

3 For the Defendants:   Louisiana Office of the Governor
             BY:  MATTHEW F. BLOCK, ESQ.
             Post Office Box 94004

4             Baton Rouge, Louisiana 70804

5 Official Court Reporter:  Toni Doyle Tusa, CCR, FCRR
             500 Poydras Street, Room B-275

6             New Orleans, Louisiana 70130
             (504) 589-7778

7

8

9

10

11 Proceedings recorded by mechanical stenography using
 computer-aided transcription software.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              <u>**INDEX**</u>

2                                                        <u>Page</u>

3   Alexander Billioux

4        Direct Examination By Mr. Faircloth         10

5        Direct Examination By Mr. Block             48

6        Cross-Examination By Mr. Faircloth          80

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **<u>PROCEEDINGS</u>**

2          **(August 14, 2020)**

3          **THE COURT:**  Good afternoon all.

4               Call the case, please.

5          **THE DEPUTY CLERK:**  Civil Action 20-2150,

6  *4 Aces Enterprises, LLC, et al. v. Governor John Bel Edwards,*

7  *et al.*

8          **THE COURT:**  Enter your appearances, Counsel.

9          **MR. FAIRCLOTH:**  Jimmy Faircloth, Katie Price, and

10  Eric Norem for the plaintiffs, Your Honor.

11          **MR. GARNER:**  Good afternoon, Your Honor.

12  James Garner, Mr. Jack Weiss, Matt Block, Chris Chocheles, and

13  Josh Force for the defendants.

14          **THE COURT:**  Thank you.  Well, each side has an hour.

15  We will begin with Mr. Faircloth and his presentation.

16          **MR. FAIRCLOTH:**  Your Honor, I want to make sure I'm

17  doing this the way you want us to do it.  My preference is, if

18  you allow it, I will do a very brief kind of overview.  Then I

19  will cut to the introduction of the evidence that I think needs

20  to be included, including very brief testimony.  Is that

21  permissible?

22          **THE COURT:**  It's your case, Counsel.

23          **MR. FAIRCLOTH:**  Thank you, Your Honor.

24               Your Honor, if I can, I'm going to do a brief

25  intro.  I'm Jimmy Faircloth.  I represent the plaintiff bar

1  owners.

2          The plaintiffs are all owners of facilities that

3  are permitted under what's called either AG or AR conditional

4  permits to sell alcohol.  The State of Louisiana really doesn't

5  recognize bars per se in any particular context except a

6  statutory scheme that governs smoking.  I'm get to that a

7  little later.

8          Today's claim before the Court deals with the

9  claim for injunctive relief only.  It asks the Court to issue

10 that injunctive relief to enforce federal law only, the

11 distinction there being we understand that because of *Pennhurst*

12 the federal courts cannot enjoin a state officer to comply with

13 state law.  That's why we have limited this particular request

14 to federal request only.  We have merely drawn --

15          **THE COURT:**  You're correct.

16          **MR. FAIRCLOTH:**  I apologize, Your Honor.

17          **THE COURT:**  You're correct.

18          **MR. FAIRCLOTH:**  Your Honor, we have narrowed the

19 petition and the claim as much as possible.  I think it's worth

20 restating -- and I'm sure the Court knows this -- we are not

21 asking you to strike down anything.  We are asking the Court to

22 enjoin enforcement of the particular orders against these

23 plaintiffs.  We have tried to be as discreet as we can be.  I

24 understand the extraordinary nature of the relief and what we

25 are asking the Court to do.

1          **THE COURT:**  Well, I want to say at this point to both

2     sides it's a pleasure when we see excellent lawyering.  I want

3     to compliment all of you on both sides because your paper and

4     your professionalism has been A-plus.

5          **MR. FAIRCLOTH:**  Thank you, Your Honor.

6          **THE COURT:**  Go ahead, Mr. Faircloth.

7          **MR. FAIRCLOTH:**  Thank you, sir.

8          Your Honor, our claims, the ones today, are

9     based on the Fifth and Fourteenth Amendment.  We allege due

10    process claims, both substantive and procedural due process,

11    under the Fifth and Fourteenth and equal protection claims

12    under the Fourteenth.

13          I admit, Your Honor, that it's been somewhat of

14    a learning curve to get up to speed to understand these orders.

15    I think the defendant appropriately pointed out to the Court in

16    one of the last filings that it appears we have changed our

17    theory.  It's not that we have changed our theory.  We pled the

18    claims.  What's happened here, Your Honor, is the orders do not

19    really mean what they say, and so it's been a learning curve on

20    our side to figure out to whom do these orders apply.

21          What's happened, Your Honor, is over the course

22    of the weeks, as the press events have rolled out and the

23    evolving data and the filings, it's become very clear,

24    Your Honor, this is an equal protection claim more than

25    anything else.  We maintain our substantive due process and our

1    procedure due process, but I will, frankly, refer to our briefs

2    and our arguments that we have made on those theories.  I would

3    like to keep the hearing today, as much as possible, focused on

4    what I think is the really genuine, most viable claim.  It's

5    a --

6             THE COURT:  Counsel, excuse me.  I don't know where

7    you go with the equal protection claim, but I am going to apply

8    the rigor of the *Jacobson/Abbott* line of cases.

9             MR. FAIRCLOTH:  Yes, sir.

10            THE COURT:  That is not negotiable.

11            MR. FAIRCLOTH:  Nor have I asked the Court.  I

12   understand that, Your Honor, the deference during a period of

13   emergency declaration.  I understand the reach of *Jacobson*, and

14   I understand *Abbott's* recognition of that, absolutely.

15            The difference in the context of equal

16   protection is the *Jacobson* opinion deals mostly with the

17   overarching goal of the declaration.  The equal protection

18   claim here goes one step further because the focus is whether

19   there's a rational relation in the classification distinction

20   that has been drawn.  I cited to the Court in our supplemental

21   information about the *Mikeska* case out of the Fifth Circuit

22   that involved Galveston Beach homeowners.  I'm not going to

23   argue the scope of that case.  I assume the Court has looked at

24   it.

25            Again, Your Honor, this case comes down to the

difference that the governor's orders have drawn with regard to
bar owners.  The bottom line is not all bars have been closed.
Bars exist in Louisiana under a permitting regime of AG
permits, which is kind of your traditional bars, versus AR
permits, which are bars operating within restaurants.  That's a
very important distinction here because the governor's order
separates those classes, and there has to be a rational
relation for that separation in order to survive equal
protection.  I agree it only has to be rational.

          **THE COURT:**  I completely agree with you, so let's get
to the chase.

          **MR. FAIRCLOTH:**  You got it, Your Honor.  What I'm
going to do first, Your Honor, is I would like to call
Dr. Billioux and ask some questions about -- and before I do
that, I will point this out to the Court.  Both sides have
submitted declarations and affidavits and a lot of information
that under an ordinary trial setting I would probably be
screaming hearsay, but I do understand in the context of this
type of case -- and the Fifth Circuit has made it clear -- that
published governmental data, the Court has enormous authority
to take judicial notice.  I understand, and I have no per se
objection to the documents that have been introduced.

               Some of the documents I think are rank hearsay,
and I don't want to object or miss the opportunity to object to
their use for the truth of the matter asserted.  An example:

1   Dr. Billioux's affidavit includes a reference to some paper out
2   of California.  I understand as an expert he certainly can rely
3   on inadmissible evidence.  I take no quarrel with that.  What
4   other journalists may have said in other states about the risk
5   of COVID or about what happens in bars should not be accepted
6   for the truth of the matter asserted.
7               So I just enter, with all due respect, into a
8   standing objection to the use of a lot of this hearsay that's
9   come in for a truth purpose.  I would like to note that for the
10  record, Your Honor.
11              **THE COURT:**  Noted.
12              **MR. FAIRCLOTH:**  Thank you, sir.  Having said that, I
13  would like to ask that Dr. Billioux -- I'm not quite sure how
14  you want to do the swearing of this, Your Honor.  I'll leave
15  that to your staff.
16              **THE COURT:**  My case manager will administer the oath.
17                      **ALEXANDER BILLIOUX,**
18  having been duly sworn, testified as follows:
19              **THE DEPUTY CLERK:**  Thank you.  Please state and spell
20  your full name for the record.
21              **THE WITNESS:**  Sure.  My name is Alexander Billioux
22  and it's spelled A-L-E-X-A-N-D-E-R, last name is
23  B-I-L-L-I-O-U-X.
24              **THE DEPUTY CLERK:**  Thank you.
25              **THE WITNESS:**  Yes, ma'am.

ALEXANDER BILLIOUX - DIRECT

**DIRECT EXAMINATION**

1

2  **BY MR. FAIRCLOTH:**

3  **Q.**   Dr. Billioux, I have the benefit of knowing a little bit

4  about your testimony last week and I have your affidavit, so

5  I'm going to cut right to the chase with some questions.  You

6  can explain any answer, of course.  I would like first to ask

7  you some questions about some of the statistical information

8  related to COVID that is referenced in your affidavit or

9  declaration and that you have spoken about on television.

10         As I understand it, Louisiana has a population of

11  approximately 4,660,000 people.  Is that accurate?

12  **A.**   That's my understanding as well.

13  **Q.**   I think that yesterday's data -- correct me if I'm

14  wrong -- indicates that there are presently 134,000 or so COVID

15  cases.  Is that correct?

16  **A.**   There's 136,737.

17  **Q.**   Okay. 136.  I stand corrected.

18  **A.**   That's correct.

19  **Q.**   Go ahead.  I'm sorry.  I don't mean to cut you off.

20  **A.**   That's as of today.  You were right for yesterday.  I was

21  just giving you today's numbers.

22  **Q.**   I understand.  I did the math on 134, you know, very

23  differently from 136.  With 134,000 cases, that means that

24  roughly, based on current data, known cases, that's 2.8 percent

25  of the population.  You would agree with that?

ALEXANDER BILLIOUX - DIRECT

1  A.   Yes, I will take your word for it.

2  Q.   Now, the COVID related deaths that have been reported as

3  of yesterday were 4,238.  Do you agree with that?

4  A.   Yes, sir.

5  Q.   So the number of deaths relative to the population is

6  .09 percent.  Does that sound about right?

7  A.   The number of identifiable COVID related deaths compared

8  to the population, yes.

9  Q.   That's less than one-tenth of one percent.  You would

10  agree with that?

11  A.   Yes.

12  Q.   Long-term care facilities are a particular area of focus

13  by the Louisiana Department of Health in the context of COVID.

14  You would agree with that?

15  A.   Yes, as congregant settings, certainly.

16  Q.   If you go to LDH's website, there's a link where you can

17  click and it will tell you the data and information about

18  long-term facilities; is that correct?

19  A.   That's correct.

20  Q.   On that link the following statement is made above the

21  data set that they have used for long-term care facilities, and

22  it says:  "A nursing home with residents who have tested

23  positive for the illness is not a threat to the general

24  public."  Are you aware that statement is on there?

25  A.   Yes, sir.

ALEXANDER BILLIOUX - DIRECT

1    **Q.**    Is that an accurate statement?

2    **A.**    Yes.  What we mean by that statement is that these are not

3    individuals who are freely circulating in public.  While they

4    have a threat to their health and certainly there's a threat to

5    the spread of COVID within those facilities, to the general

6    public those individuals contained within that facility do not

7    represent a general threat.

8    **Q.**    I understand.  You agree that the way I read it is what it

9    says?

10   **A.**    Yes, sir.

11   **Q.**    The reason is because those particular patients are

12   quarantined from the general population.  Is that the primary

13   reason?

14   **A.**    Yes.  It's in distinction to, say, an outbreak at a public

15   facility.

16   **Q.**    The long-term care facilities have the highest percentage

17   of cases relative to their population; is that correct?

18   **A.**    Of identified cases, yes.

19   **Q.**    And the highest percentage of deaths?

20   **A.**    Of identified deaths, yes.

21   **Q.**    The long-term care facilities themselves would surely

22   qualify as a hot spot or a site of an outbreak under the

23   definitions that were used by the White House task force,

24   wouldn't they?

25   **A.**    They do and we identify them as such.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   If the nursing facilities or long-term care facilities do
2  not pose a threat of transmission to the general public, then
3  the corollary must be true, as well, that the general public
4  does not pose a risk of threat to the nursing home populations.
5  Would you accept that?
6  **A.**   No, I don't agree with that.
7  **Q.**   Well, how is there a difference?
8  **A.**   Well, because these individuals are by definition
9  dependent on others for their health and welfare and,
10  importantly, on the staff who come and serve those services.
11  They themselves are members of the general public who are
12  exposed to the community spread.  As we have seen in Phase Two
13  with rising cases, what started as a largely out in the
14  community epidemic has now started to creep back into nursing
15  homes and we presume largely spread by staff.
16  **Q.**   If the conduit, then, for the transmission would be the
17  employees or the staff of the nursing home, then the nursing
18  home population, which has the highest percentage of cases, is
19  indeed a threat to the general public.  I'm trying to figure
20  out how the staff moving through doesn't create a risk on both
21  sides or if --
22  **A.**   Because -- sorry, Counsel.
23  **Q.**   Am I correct?
24  **A.**   No.  By our assessment, again, the reintroduction is
25  happening driven by staff.  You will see similar communications

ALEXANDER BILLIOUX - DIRECT

1    coming from the White House and from the recommendations that
2    even when transmission is no longer identified amongst
3    residents, staff should continue to be tested on a regular
4    basis because they present the risk for transmission in nursing
5    homes.
6            That localized transmission after staff have
7    introduced it is not, in our assessment right now given the
8    level of incidence in the community, as big a threat as those
9    individuals being out and about in their daily life.
10   Q.   The biggest threat is the transmission of COVID through a
11   bar?
12   A.   It would be hard for me to assess that.
13   Q.   Have you found any bars that have a COVID rate that
14   approaches those that are in long-term facilities?
15   A.   I'm not aware of that.  I don't know the data to compare.
16   Q.   Nursing homes -- I'm saying long-term care facilities
17   because I think that's a broader class.
18            MR. FAIRCLOTH:  If we could pull up Exhibit F,
19   please, Plaintiffs' Exhibit F.
20            Your Honor, we provided your staff a preview of
21   these exhibits, so just give us a moment and we will get them
22   up.
23            THE DEPUTY CLERK:  Counsel, will y'all be displaying
24   the exhibits?
25            MR. FAIRCLOTH:  We were informed that y'all would be

**ALEXANDER BILLIOUX - DIRECT**

1    in charge of exhibits; we merely had to give you the listing of

2    it.  We can.  We will have to figure out how to do it real

3    quick, but I'm certain we can.

4            **THE DEPUTY CLERK:**  Please, because I do not have the

5    capability to show them on the screen right now.

6            **MR. FAIRCLOTH:**  Your Honor, if you will give us one

7    second, I will have somebody with these skills to do this.

8                    Here we go.

9    **BY MR. FAIRCLOTH:**

10   **Q.**   I have put up what we have submitted as Exhibit F.  You

11   can just take a quick glance at it.  This does appear to be at

12   least the format of the data that's assessed for long-term care

13   facilities, correct?

14   **A.**   Specifically for nursing homes.  I will make that

15   distinction.

16   **Q.**   I understand.

17   **A.**   Actually -- yeah, for nursing homes.

18   **Q.**   If you will take a look in the middle of the notes on the

19   data, there's a sentence approximately in the middle that says

20   "currently."  It says:  "Currently all deaths in individuals

21   with COVID positive lab results are being counted."  Do you see

22   that statement?

23   **A.**   Yes, sir.

24   **Q.**   Hasn't some new data come out saying that there's a fair

25   percentage of the elderly population that are asymptomatic to

ALEXANDER BILLIOUX - DIRECT

1  COVID?

2  **A.**   In the general population, there are individuals who are

3  COVID infected and asymptomatic, yes.

4  **Q.**   There's people in the long-term care facilities and

5  nursing homes who are asymptomatic on COVID as well.  Would you

6  agree with that?

7  **A.**   That is correct.

8  **Q.**   Okay.  But even though somebody --

9  **A.**   Especially at the time of testing.  They may subsequently

10  become symptomatic.

11  **Q.**   Yes, but not after they die.  You would agree with that?

12  **A.**   Postmortem testing is performed if there is suspicion

13  clinically by the provider or the coroner.

14  **Q.**   At present there are tests being done on everybody that's

15  dying in a nursing home.  There's blood work being done on

16  every mortality in a nursing home to screen for COVID.  Is that

17  correct?

18  **A.**   I don't believe that's correct.  We don't do blood work

19  for COVID at a population level.  Again, the decision to test

20  individuals postmortem is up to providers and the coroner, so

21  there's not a policy that that has to be performed.

22  **Q.**   I understand.

23  **A.**   I'm not sure that that's correct.

24  **Q.**   Okay.

25  **A.**   We are testing more residents.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   But the numbers here we can at least conclude do reflect

2  those who passed in a nursing home, all of whom had COVID, but

3  not all of them were necessarily symptomatic.  Do you agree

4  with that?

5  **A.**   That's correct.

6  **Q.**   You certainly understand the difference between causation

7  and correlation, right?

8  **A.**   I do.

9  **Q.**   This is not an indication that these folks died as a cause

10  of COVID.  It's an indication that they died with COVID.  Is

11  that correct?

12  **A.**   At the very least, it's an indication that they died with

13  COVID.  At this level of information, it's hard to know the

14  individual details.

15  **Q.**   I understand.  According to Exhibit F -- and this document

16  is August 5 -- there's a total of 1,645 individuals with COVID

17  who died in nursing homes.  Does that sound correct?  The

18  totals weren't on the sheet.  We had to add the totals.

19  Assuming my math is correct, does that sound right?

20  **A.**   Can you describe for me -- you said you just summed the

21  totals of deaths on this report?

22  **Q.**   That's correct.

23  **A.**   Then I'm going to assume your math is correct.  I have not

24  done that calculation myself on this data.

25  **Q.**   Now, we did not introduce the document because it was more

ALEXANDER BILLIOUX - DIRECT

1  recent, but on the 12th there was a new spreadsheet like this

2  that was posted on LDH's website that had the total at 1,773.

3  Does that sound about right?

4  A.   Yes, sir.

5  Q.   Now, earlier we talked about the number of deaths as of

6  yesterday.  That was 4,238.  4,238, if you subtract the nursing

7  home deaths, leaves you with 2,465 in the general population.

8  Does that sound about right?

9  A.   Sounds about right.

10 Q.   That is .05 percent of the general population, relative to

11 the general population.  Do you agree with that?

12 A.   Relative to the total general population of the state of

13 Louisiana, that probably sounds right.

14 Q.   That's correct.  I have taken the long-term care patients

15 out of this very same review.  So that is one-half of one-tenth

16 of a percent of the general population outside nursing homes,

17 correct?

18 A.   Yes.

19 Q.   I want to talk now quickly about the tracing data.  This

20 is Plaintiffs' E, or D-19 I think it's also.  They are crossed.

21 This is the outbreak or tracing data that's posted on LDH's

22 website.  Does it appear familiar to you?

23 A.   Yes, sir.

24 Q.   If we can just take a quick look at these numbers, I would

25 like to ask you a few questions.  The bars that are listed

**ALEXANDER BILLIOUX - DIRECT**

1   here, where it says "Bar:  41 outbreaks, 464 cases," what types
2   of bars are those?
3   A.   These are bars operating as a bar.  Are you asking are
4   they bars -- can you ask me another question specifically.
5   These are bars.
6   Q.   Okay.  What's your definition of a bar for purpose of this
7   tracing data?
8   A.   So I think we use the Department of Health distinction,
9   which would be we have two classes of bars, bars with a food
10  license and bars without a food license.
11  Q.   So this represents bars without a food license?
12  A.   This, I think, probably is inclusive of both, but I would
13  have to verify.
14  Q.   So this includes all bars with an AG permit and with an AR
15  permit.  Would you agree with that?
16  A.   Again, I'm not actually completely clear on that.
17  Q.   If you are going to draw a classification as to which ones
18  to close or restrict based on that classification, would you
19  not need to know that if the tracing data is going to be a
20  tool?
21  A.   Well, I would agree that that needs to be known within my
22  department, yeah.  My infectious disease epidemiology lead
23  would possibly do a better job of answering your question than
24  me.
25  Q.   As we sit here today with you as a spokesman for the

ALEXANDER BILLIOUX - DIRECT

1  administration, you can't give us that information?

2  **A.**   I don't have that right now.

3  **Q.**   The decisions that were made with regard to what I will

4  refer to globally as the bar closure orders, they weren't made

5  with the benefit of that distinction in regards to the tracing,

6  were they?

7  **A.**   No, they might have.  Again, the decisions were made --

8  well, as you saw from my testimony before, I'm not the only

9  representative in the room speaking with the governor at that

10 time, including individuals who do know those distinctions.

11 **Q.**   Okay.  Let me ask you this.  It's been widely reported

12 that at least, I think, or your affidavit says more than

13 100 cases came from the Tigerland Memorial Day weekend event;

14 is that correct?

15 **A.**   That's correct.

16 **Q.**   How many bars are in that set, what's referred to globally

17 as Tigerland?

18 **A.**   My understanding is four.

19 **Q.**   So of the 41 we are looking at on this exhibit, that takes

20 us down to 37 non-Tigerland bars, correct?

21 **A.**   I believe that those might have been treated as a single

22 outbreak.

23 **Q.**   Okay.  So let's treat it as 40.  Do you know if any of

24 those 40 are Class AG permit holders as opposed to Class AR

25 permit holders?

ALEXANDER BILLIOUX - DIRECT

1  **A.**   I do not know how the breakdown of Class AG or AR is in

2  these numbers.

3  **Q.**   So the bottom line is LDH does not have any data showing

4  that these cases, these outbreaks, are traceable specifically

5  to AG-permitted bars?

6  **A.**   I don't know.

7  **Q.**   Or to any AG-permitted bars?

8          **MR. BLOCK:**  Your Honor, at this point in time I'm

9  going to object as asked and answered.  He has said several

10 times that he does not have information about the distinction

11 in front of him between AG- and AR-permitted facilities.

12         **MR. FAIRCLOTH:**  Your Honor, he is the representative

13 of the governor's office.  I'm testing the basis.  This

14 document has been pointed to as forming a basis of their

15 decision which is directly at issue in this case.  I can't

16 think of anything more genuine or more relevant to equal

17 protection than that question.

18              Did we lose the judge?

19         **THE COURT:**  Can you all hear me now?

20         **MR. BLOCK:**  Yes, sir, we can.

21         **THE COURT:**  Let me make something perfectly clear.  I

22 don't know whether this witness is one who can satisfy the

23 *Jacobson/Abbott* rigid test.  I'm interested in one question,

24 and that is I understand -- Doctor, you correct me if I'm

25 wrong -- that the distinction between a bar and a restaurant

ALEXANDER BILLIOUX - DIRECT

1  that sells booze is that a bar might have a food license, but

2  it sells food only incidentally.  Is that correct?

3       THE WITNESS:  That's my understanding as well,

4  Your Honor.

5       THE COURT:  My question to you, then, is does the

6  data show that bar patrons -- bar, not restaurant bar.  Does

7  the data show that bar patrons are more contagious than

8  restaurant bar patrons?

9       THE WITNESS:  As individual patrons?

10       THE COURT:  I have to decide whether the governor

11  screwed up.

12       THE WITNESS:  Sorry, Your Honor.  I guess --

13       THE COURT:  Excuse me.  My question is:  Have you-all

14  had any data that shows that bar patrons are more contagious

15  than restaurant bar patrons?  The reason I'm concerned about

16  that is it seems to me that in a restaurant with a bar, the

17  lack of social distancing and wearing of masks and all those

18  other precautions are equally as violative of public health

19  considerations as perhaps bars that don't have food or as

20  opposed to restaurants.  So you understand my concern?

21       THE WITNESS:  I do, Your Honor.  I think I understand

22  your question better as well.

23       THE COURT:  My question is:  Why did the governor

24  make that distinction, on the basis of what data?

25       THE WITNESS:  Right.  So it's on the basis of -- what

ALEXANDER BILLIOUX - DIRECT

1   I was trying to clarify is the individuals themselves are

2   probably equally infectious as individuals.  The question is

3   the social activity that they are engaged in, which does have a

4   different level of infectiousness.

5            Individuals going to a restaurant or even a bar

6   that serves food for the primary purpose of eating, sitting at

7   a table, staying with their group, and generally an environment

8   without as much noise as a bar for bar sake are less likely to

9   spread, cause a community spread or an outbreak, than

10  individuals who are going to a bar or bar with food for the

11  primary purpose of socialization and circulating around the bar

12  in the context of usually being longer in those facilities,

13  loud music, meaning people have to lean in closer and

14  potentially be breathing closer to each other, and that the

15  duration without a mask while in a bar would be higher.  And

16  that's the theory --

17            **THE COURT:**  Sorry.  Go ahead.

18            **THE WITNESS:**  I was just going to say that's the

19  theory.  Then to back that up, there are the subsequent data

20  that we have witnessed before we actually opened up bars, in

21  countries like South Korea and United Kingdom where they also

22  specifically highlighted that bars and not restaurants were

23  associated -- bars and nightclubs and not restaurants were

24  associated with large numbers of cases and had to be shut down,

25  and in our own data where we found that bars were associated

ALEXANDER BILLIOUX - DIRECT

1    with a large number of cases whereas restaurants were not
2    associated with as many cases.
3         THE COURT:  Good.  I'm glad you got there because I
4    think it's a waste of my time to consider data from nursing
5    homes.  You just spoke what in my mind is the key issue, and
6    that is what is the data that distinguishes the two different
7    proclamations -- one bars that only incidentally serve food and
8    one restaurants -- because it seems to me that even in a
9    restaurant that has a bar, some of those same dangers exist in
10   the bar side of the restaurant.  So I'm wondering what data you
11   have.
12             I don't really care about nursing homes.  That's
13   beside the point.  I want to know what data afforded the
14   governor the distinction that he made between bars and
15   restaurants.
16        THE WITNESS:  It's actually on this piece of
17   evidence, Your Honor.  If we look down at restaurants, even
18   though there's a large number of clusters there at 35, we see
19   the cases associated with those clusters are much smaller.
20             I'll note, in general, it's very difficult to
21   link these outbreaks.  It's sort of a tip of the iceberg when
22   we see these.  So we also know that these numbers represent a
23   much larger transmission that we are not able to actually link
24   back to a significant level of rigor.
25        THE COURT:  What's the source of that data?  That's

ALEXANDER BILLIOUX - DIRECT

1  your own data?

2          **THE WITNESS:**  This comes from both contact tracing,

3  which is data we generate by reaching out to individuals, as

4  well as public reports, as was the case with the Tigerland

5  bars.

6          **THE COURT:**  That's what formed the basis of the two

7  differing proclamations?

8          **THE WITNESS:**  Yes, sir.

9          **THE COURT:**  If I want to be fair, let me see if I can

10  characterize it in the plain and simple, maybe ignorant terms

11  of a federal judge.  The data that formed the basis of the

12  governor's two different proclamations -- one naming bars even

13  though they might have had a food service and one naming

14  restaurants which even may have had a bar service -- is the

15  data that you just mentioned?

16          **THE WITNESS:**  Yes, sir.

17          **THE COURT:**  All right.  Go ahead, Counsel.

18          **MR. FAIRCLOTH:**  Thank you, Your Honor.

19          **THE COURT:**  I don't care about nursing homes.  I

20  don't know where you are going with that.

21          **MR. FAIRCLOTH:**  I understand, Your Honor.  I'll move.

22          **THE COURT:**  I'm concerned about what formed the

23  governor's distinctions within the rigorous ambit of *Jacobson*

24  and *Abbott*.  That's what I'm concerned with.

25          **MR. FAIRCLOTH:**  Yes, sir.

ALEXANDER BILLIOUX - DIRECT

1          **THE COURT:**  Now, the witness has said that they have

2    data that shows that people who go to bars are more likely to

3    get sick or more likely to spread the disease than people who

4    are in restaurants even though that restaurant might have bar

5    service.  Let's see where you can go from there.  That's what

6    interests me.

7    **BY MR. FAIRCLOTH:**

8    **Q.**   Dr. Billioux, I want to be clear.  Do you have any data

9    that traces COVID cases or the risk of COVID transmission that

10   is based on the differential between a bar that operates

11   exclusively as a bar as opposed to a bar that operates within a

12   restaurant?  What data do you have as to that distinction?

13         **THE COURT:**  Good question.

14         **THE WITNESS:**  When you say a bar that operates within

15   a restaurant, are you talking -- sorry, just for clarification,

16   if I might.  Are you talking about patrons sitting at a bar in

17   otherwise a restaurant or are you talking about a bar that's

18   operating as a restaurant, which was --

19         **THE COURT:**  Doctor, if I can clarify it for you, I

20   think counsel's question was perfectly direct.  What data do

21   you have or did you have to make the distinction between the

22   two resolutions or proclamations which separated out a bar from

23   a restaurant with a bar?

24              Counsel, is that your question?

25         **MR. FAIRCLOTH:**  That is exactly it, Your Honor.

ALEXANDER BILLIOUX - DIRECT

1          THE COURT:  And that's my question.

2          THE WITNESS:  So, then, the primary data are what are

3    shown here, where we look at bars with a large number of

4    outbreaks and a very large number of associated cases and

5    restaurants with a smaller number of outbreaks and the

6    proportion of cases associated with those outbreaks even

7    smaller.

8          THE COURT:  Now, if I could interrupt for a second, I

9    believe that the plaintiffs, the bar owners, claim -- and this

10   is a question for you, Doctor -- that only .45 percent of the

11   COVID cases in Louisiana have been traced to bars.  Do you

12   agree with that statement?

13         THE WITNESS:  Yes, Your Honor, I would agree with

14   that statement.

15         THE COURT:  So if I could take your testimony one

16   step further, it's your testimony that the two proclamations

17   were based upon data which showed that less than one percent of

18   the COVID cases were traceable to bars without food?

19         THE WITNESS:  Not entirely, Your Honor.  While that

20   number is factually accurate, it was based upon the number of

21   cases -- the proportion of bar-related cases amongst the cases

22   we could trace to an origin, in other words, ones that were not

23   just community spread and we couldn't find a link.  So of that

24   2,500 or so cases, they represented a quarter of the cases that

25   we could actually link.

ALEXANDER BILLIOUX - DIRECT

1            What the governor's decision, I presume, was

2    made on was our identification that of all of the settings that

3    we have listed here, 25 percent of the settings and 25 percent

4    of the cases were associated with bars specifically.

5            **THE COURT:**  I see.  Thank you.

6            **THE WITNESS:**  Yes, sir.  Yes, Your Honor.

7    BY MR. FAIRCLOTH:

8    **Q.**    Dr. Billioux, maybe I'm misunderstanding.  This tracing

9    data we are looking at, where it says "Bar:  41 outbreaks,

10   464 cases," that does not differentiate between bars that have

11   an AG permit and don't sell food at any percentage or bars that

12   have an AR permit and sell food.  I don't want that to kind of

13   vaguely get glossed over here because that's the nub of the

14   coconut.  You don't have any data in this tracing data that

15   draws that distinction at all.  Bars here mean all bars,

16   correct?

17   **A.**    So I don't know.  When you asked me previously whether I

18   knew that distinction, I don't know.  I believe that this means

19   all bars, but I can't say that definitively.

20   **Q.**    But the order draws that distinction.  The closure order

21   itself in its application draws the distinction between AG

22   permit holders and AR permit holders, does it not?

23   **A.**    I believe it does.

24   **Q.**    Okay.  But yet you don't have any data to support that

25   distinction, do you?

ALEXANDER BILLIOUX - DIRECT

1  **A.**   My understanding -- and I may not be correct here -- is
2  that the distinction you're talking about is true.  However,
3  the AG bar owners were limited in not being able to behave as
4  bars.  They had to behave as restaurants --
5  **Q.**   Let me give you an example.
6  **A.**   -- meaning that it was not that we were saying that
7  there's a difference there.  I think we are saying they have to
8  operate as restaurants, which are a lower risk setting.
9  **Q.**   No, I'm focused on --
10           **THE COURT:**  Wait, wait, wait.  That's the question.
11  You say if a bar operates at a restaurant, it's at a lower risk
12  setting. I think this is what counsel wants to know.  It's what
13  I want to know.  What data supports that statement?
14           **THE WITNESS:**  If any organization is acting as a
15  restaurant and thus patrons are coming for that primary purpose
16  of eating with their party, that is an activity that our data
17  and data from other states and other countries demonstrate is
18  lower risk than individuals coming to a bar for the primary
19  purpose of drinking and socializing.
20           **THE COURT:**  What is the difference in that data?
21           **THE WITNESS:**  I'm not sure I understand your
22  question, Your Honor, but I think the difference is the numbers
23  in this report.
24           **THE COURT:**  What data tells you that people at
25  restaurants with bars are less contagious or less likely to be

ALEXANDER BILLIOUX - DIRECT

1  contagious than only people who go to bars only and not

2  restaurants?  What data separates out bars and restaurants?

3         **THE WITNESS:**  Sorry, Your Honor.  So two levels of

4  evidence:

5            The first would be the theoretical difference,

6  again, of what I described before, the biological plausibility

7  that it is safer to be with your dining party, sitting stably

8  at a table and then leaving, where you are not circulating,

9  versus coming to the bar for the purpose of socialization,

10  which naturally means you are going to have more contacts, and

11  again in the context of loud music, leaning in, more likely to

12  spread.  That's the first level of sort of evidence that we

13  had.

14            Then the second was based off of these data on

15  this spreadsheet where you see empirically, having both of them

16  operating as they normally would, we are associating many more

17  cases and outbreaks with bars than restaurants in operation

18  around the state, Your Honor.

19         **THE COURT:**  More outbreaks at bars?

20         **THE WITNESS:**  Yes, sir.  Yes, Your Honor.

21         **THE COURT:**  Can you quantify that?

22         **THE WITNESS:**  So I don't know the date, sir, of this

23  report.  I think it would be fairest to go back to the report

24  on the date that we presented the data to the governor.  The

25  reason I say that is because this is cumulative, which means

ALEXANDER BILLIOUX - DIRECT

1    that if this is the most recent update, there have been

2    restaurants that have added cases whereas bars are static now

3    because there are no bars that are in operation.

4                THE COURT:  Your testimony is that that data was

5    shared with the governor during the process of authoring these

6    two proclamations?  Is that your testimony?

7                THE WITNESS:  Yes, sir.

8                THE COURT:  The governor had that data?

9                THE WITNESS:  Yes, sir.

10                THE COURT:  Thank you.

11                Go ahead, Counsel.

12    BY MR. FAIRCLOTH:

13    Q.    The data you're talking about, you're talking about data

14    that draws a distinction between bars under AG versus bars

15    under AR or bars in a restaurant?  You have got data that draws

16    that distinction?

17    A.    No.  I was talking about the data on this form.  Again, I

18    don't know what date this particular table is from.  I was

19    trying to clarify for His Honor that the fairer way to assess

20    the comparison between restaurants and bars would be to go back

21    to that point in time.  So while bars have stayed static since

22    that point in time, restaurants have continued to accumulate

23    outbreaks.  At that time 25 percent of outbreaks and 25 percent

24    of cases, roughly, were specifically associated with bars, and

25    restaurants and everything else on the list didn't come to that

ALEXANDER BILLIOUX - DIRECT

1   level, not close.

2   **Q.**   I apologize.  This document is dated July 29, 2020.

3           I want to be clear.  Let's kind of step away from

4   restaurants a second and let's talk about the activity of bars.

5   I'm trying to see whether you have any data that says that a

6   bar -- the bars that have been subject to the closure, whether

7   that particular class of bars creates any more risk than a bar

8   that exists within a restaurant.

9           I will give an example.  In New Orleans you have lots

10  of bars, lots of companies, lots of restaurants.  We have all

11  been to them, and I don't want to name any of them because I

12  don't want to disparage anyone.  But there's a lot of bars in

13  restaurants, either in the middle of the restaurant or in a

14  separate room.  It's still a full-service bar.

15          Now, do the patrons in that bar in a restaurant pose

16  any greater risk to the general population than a patron that

17  is in a mom-and-pop regular bar that has been closed under the

18  order?  I don't really care about the fact that they are

19  serving food.  I'm looking for patron activity in the bar, one

20  bar standing alone versus the bar that's in a restaurant.  Is

21  there any data to support that distinction?

22  **A.**   So I would argue, sir, that these data do support that

23  distinction.  So if we assume that there is this group of bars

24  that are operating as restaurants under a food license, then

25  they would essentially bridge the level of outbreak you would

ALEXANDER BILLIOUX - DIRECT

1   expect to see in a restaurant.

2          The fact that we do see higher rate of outbreaks

3   related to bars, even if it combines with those, demonstrates

4   that there is, I think, an increased risk of being a patron at

5   a bar for the reasons that I have previously stated.

6   **Q.**   A restaurant bar -- let's pick Walk-On's.  I love that

7   place.  The Walk-On's bar, where would it fall in this?  Is it

8   a bar or is it a restaurant in this data set?

9   **A.**   I believe Walk-On's would be listed as a restaurant.

10  **Q.**   Why do you believe that?

11  **A.**   Because I think it's primarily permitted as a restaurant

12  that has a bar, but I don't know definitively.

13  **Q.**   Well, did the tracing data ask the folks where the

14  transmission occurred?  You have that data to identify in

15  particular where these outbreaks occurred.  We ought to be able

16  to determine are these bars, are these bars in restaurants.

17          **THE COURT:**  Well, Counsel, excuse me for

18  interrupting, but in this mass of documentary evidence that's

19  been submitted, I seem to remember a distinction because I

20  asked myself the same question.  I don't know where I got it

21  from, but I made a note of:  What is a bar?  What about a

22  restaurant with a bar?

23          I saw somewhere in some document that a bar,

24  even though it might have food, is classified as a bar because

25  food service is "incidental only."  I don't know where I saw

ALEXANDER BILLIOUX - DIRECT

1  that, but that may help you in your questioning because I had
2  the same question.
3  BY MR. FAIRCLOTH:
4  **Q.**   Dr. Billioux, your supplemental affidavit says that you
5  are very familiar with the regulations or the guidance issued
6  by the state fire marshal, and I assume you're prepared to
7  testify to it.  This goes to this question.
8  **A.**   The OpenSafely documents that I am familiar with make the
9  distinction based on restaurants with an LDH food license
10 versus restaurants without an LDH food license.  Our licenses
11 are not AG, AR.
12 **Q.**   You refer to it as a regulation.  This is not a
13 regulation.  This is a guidance document that has not been
14 promulgated under the APA; is that correct?
15 **A.**   Apologies.  Apologies.  It is a guidance document.
16 **Q.**   You know what the APA is and you are fully aware that
17 rules have to be promulgated, including emergency rules, and
18 there's legislative oversight and there's a process for that.
19 You are aware of that, are you not?
20          **MR. BLOCK:**  Your Honor, I'm going to object.  That
21 calls for a legal conclusion from a medical witness.  I just
22 don't think that's proper for this witness to testify to.
23          **THE COURT:**  Sustained.
24          **MR. FAIRCLOTH:**  He submitted an affidavit.
25          **THE COURT:**  Sustained.

ALEXANDER BILLIOUX - DIRECT

1        **MR. FAIRCLOTH:**  Yes, Your Honor.

2  **BY MR. FAIRCLOTH:**

3  **Q.**   The distinction that the fire marshal draws between

4  restaurants and saying incidental service of alcohol with food

5  is not the law, do you know that one way or the other?

6        **MR. BLOCK:**  Your Honor, I'm going to object again.

7  He is asking for what is the law and what is not the law.  It's

8  not proper testimony for a medical expert.

9        **THE COURT:**  Sustained.

10  **BY MR. FAIRCLOTH:**

11  **Q.**   Well, then tell us, Dr. Billioux, who is going to testify

12  for the governor's office to explain this distinction --

13  **A.**   Sorry.  Can you --

14  **Q.**   -- if not you?

15        **MR. BLOCK:**  Your Honor, I'm going to object to the

16  relevance of the question about what witness is going to come

17  next.  It's Mr. Faircloth's burden to prove his case, not this

18  witness' burden.

19        **THE COURT:**  Well, actually I think in my mind the

20  question has been asked and answered.  Dr. Billioux, if I

21  understand his testimony -- I made some notes.  I admittedly am

22  not a good notetaker, but I believe his testimony is that --

23            Doctor, you correct me if I'm mistaken.

24            I believe his testimony a little while ago was

25  that 25 percent of the tracing data relates to bars only and

ALEXANDER BILLIOUX - DIRECT

1   shows that socialization is more likely at bars and, therefore,
2   more outbreaks at bars, which have, by his testimony, a higher
3   rate of outbreaks.
4              Now, that focuses directly on *Jacobson* and
5   *Abbott*.  Counsel, I want you to understand.  Unless another
6   court tells me I'm wrong, I believe that that is the data and
7   the test that I am bound to apply under *Jacobson* and *Abbott*.  I
8   don't know how it's going to come out, but it's those two cases
9   and those answers by Dr. Billioux that were basically in
10  response to my questions a few minutes ago.
11             You can go ahead.  Go ahead.
12  BY MR. FAIRCLOTH:
13  Q.   Dr. Billioux, did you tell Judge Feldman that your data
14  for bars here is for only bars?  I think you said it's for bars
15  without differentiating between bars in bars and bars in
16  restaurants.  Which is it?
17  A.   Counsel, if I can clarify, when we do this through contact
18  tracing, when we get information through contact tracing, we
19  are asking the individual where were the places that they went.
20  Where they tell us, you know, "I went to a bar," whether that
21  bar is in a restaurant or that bar is operating as a bar, it's
22  linked back to the bar.  So we do make a distinction on
23  somebody who has gone to a location operating as a restaurant
24  and say they went to the restaurant versus somebody who says
25  they went to a bar.

ALEXANDER BILLIOUX - DIRECT

1          What I was saying is I don't have in my hands the
2   ability to tell you whether that location is an AR or AG.  But
3   if somebody told us they went to Walk-On's and described it as
4   "I went to the bar to have some drinks that evening," that
5   would be a bar in our data and not a restaurant.
6               THE COURT:  Even if it had food service?
7               THE WITNESS:  I believe that's my understanding.  I
8   don't think that my contact tracers go back afterwards and try
9   to differentiate the licenses held by those facilities.
10              THE COURT:  That's what I understood your testimony
11  to be.
12  BY MR. FAIRCLOTH:
13  Q.   If I went to one of the Baton Rouge steakhouses that have
14  really nice bars and that was the transmission source, and I
15  was contacted by one of your tracers and I told them I got it
16  at the bar at one of those really nice steakhouses, that would
17  be included under "Bar," would it not?
18  A.   I believe so, if you said, "I went to the bar," yes.
19  Q.   So the bottom line is your data does not draw the
20  distinction between bars in bars and bars within restaurants.
21  Let's be clear.
22  A.   Our data does not draw the -- sorry.  Can you say that
23  again or maybe just slower, and I will try to catch up with
24  you.
25  Q.   Your data does not draw the distinction between bars that

ALEXANDER BILLIOUX - DIRECT

```
 1   operate under AG permits as traditional bars and bars that
 2   operate within restaurants.  It does not draw that distinction.
 3          MR. BLOCK:  Your Honor, I'm going to object again.
 4   This whole line of questioning has been asked and answered
 5   several times over.  I think if the court reporter read it
 6   back, this almost exact question would have been asked several
 7   times over.
 8          THE COURT:  Well, I thought so too, but I'm going to
 9   let him answer it.  You will have an opportunity to
10   cross-examine him as long as you want.
11              Repeat the question so the witness can answer
12   it, Mr. Faircloth.
13   BY MR. FAIRCLOTH:
14   Q.   The data with regard to bars that we are looking at on the
15   tracing information sheet does not draw a distinction between a
16   bar operating as an AG bar or a bar within a restaurant that is
17   operating as an AR bar, does it?
18   A.   That's correct.
19   Q.   Thank you.  The percentages you talked about earlier about
20   bars and the amount of the tracing to bars or outbreaks, this
21   represents what percentage of the total cases of COVID?
22   A.   Off the top of my head, I don't know.  But again, sir, as
23   a total, that 2,212 represents a relatively small fraction of
24   the 130 -- I think at this time there's probably
25   127-something-thousand cases of COVID.  However, the vast
```

ALEXANDER BILLIOUX - DIRECT

1    majority of cases we are not able to trace back to a source.

2    Of those that we are able to trace back to a source, they

3    represent a significant proportion of those, and these are a

4    proportional representation of what's going on in our

5    community.

6         THE COURT:  Excuse me.  Let me go back a second.  Did

7    I hear you say that your data does not distinguish between a

8    bar and a restaurant with a bar?

9         THE WITNESS:  I may not be understanding the way you

10   are asking it.  What I would say is that if --

11        THE COURT:  Well, hold on.  Let me try once more.

12        THE WITNESS:  Yes, sir.  Yes, Your Honor.

13        THE COURT:  Just a second, Doctor.  I'm going to

14   speak it to you in English, and you're under oath.  If I think

15   that you're trying to avoid answering my question, you have a

16   big problem on your hands.

17        THE WITNESS:  Of course.

18        THE COURT:  So let me ask you again.  Is it true that

19   your data, the result of which was the two proclamations, one

20   about bars and one about restaurants, does not distinguish

21   between a bar on the one hand and a restaurant with a bar on

22   the other?  Yes or no?

23        THE WITNESS:  Yes.  Your Honor, can I just make sure

24   that my reasoning is fitting with yours because I would just

25   flip the way the latter is said.  What I would say is this data

ALEXANDER BILLIOUX - DIRECT

1   does not make a distinction between somebody identifying their

2   risk as being at a bar versus at a bar in a restaurant.

3        THE COURT:  So Mr. Faircloth has every reason to ask

4   you if your data wasn't aware of that distinction, what and how

5   did the difference reflected in the two proclamations come

6   about?  How did you ultimately distinguish between a bar on one

7   hand and a restaurant that had a bar?

8        THE WITNESS:  We distinguished between patrons whose

9   associated outbreak was attending a bar even if that bar was

10  located in a restaurant -- because that's what we get through

11  contact tracing -- and patrons whose cases were associated with

12  restaurants even if that food service was offered in a bar that

13  had a preponderance of food, that had a food license.

14       THE COURT:  As a result of which, if somebody went to

15  a restaurant for dinner and had a drink at the bar before going

16  into the restaurant, your data would not be reflective of that;

17  is that correct?  We don't know.

18       THE WITNESS:  I don't know.  If they said to us, sir,

19  "I went to dinner at this restaurant," we wouldn't ask about a

20  drink.

21       THE COURT:  I'm trying to figure out how the governor

22  of Louisiana made a distinction between a bar on one hand and a

23  bar at a restaurant with another.  If I understand what you

24  just said, if somebody went to a restaurant and had dinner,

25  later went into the bar and had a drink and got infected, that

ALEXANDER BILLIOUX - DIRECT

1   restaurant can still stay open.  But if somebody just went to

2   the bar and got sick or somebody got sick from them, that bar

3   can't remain open.  So what's the distinction?

4           THE WITNESS:  The bars with a food license, sir, also

5   require that you drink at a table essentially as you would be

6   seated at a restaurant.  I guess I'm not sure that I

7   understand --

8           THE COURT:  Doctor, that's just absolutely false.

9   That is pure fancy.  There are many restaurants with bars, and

10  people will stop at the bar before going into the restaurant

11  and have a few drinks.

12          THE WITNESS:  Yes, sir.  Yes, Your Honor.

13          THE COURT:  What I'm trying to figure out is whether

14  or not the distinction that the governor draws between a bar as

15  opposed to a bar with a restaurant has any rational basis.  I'm

16  trying to understand how the governor came to make that

17  distinction and is there any data that supports that

18  distinction, and I haven't heard it from you yet.

19          THE WITNESS:  Yes, Your Honor.  We make the

20  distinction between the primary activity of the individual that

21  we are tracing.  If the individual told us their primary

22  activity was going to a bar versus going to a restaurant,

23  that's where the distinction are in these data and how they are

24  reflected.

25          THE COURT:  So even if somebody went to a restaurant

**ALEXANDER BILLIOUX - DIRECT**

1   but stopped at the bar first and then went into the restaurant,

2   socially distancing and everything, but ended up with the

3   virus, under the framework that exists today in the state of

4   Louisiana, that restaurant could stay open even if the patron

5   got sick in the bar.  Is that a fair statement?

6           **THE WITNESS:**  I believe so, Your Honor, yes.

7           **THE COURT:**  So my question again is:  If that's true,

8   then what is the basis for the distinction drawn between the

9   two proclamations, between a bar and a restaurant?  Why is a

10  restaurant allowed to stay open if some patron stopped at the

11  bar first and had a drink before going in to get some food and

12  ended up getting sick?  Why is that establishment allowed to

13  remain open but the bar, which only incidentally served food,

14  is not allowed to remain open?

15          **THE WITNESS:**  Because on average, even if there is

16  that behavior as you are describing it, restaurants acting as a

17  restaurant, even if they have a bar, are associated with fewer

18  of these cases, as you see here, sir.  I think the governor, as

19  we were giving him public health advice on our concerns, was

20  trying to impose the fewest new restrictions to commerce in

21  general.  He was willing to take, I think, that risk, but again

22  I can't speak to his thoughts.

23          **THE COURT:**  So, therefore, 25 percent of your tracing

24  data applied to people who said they went to bars for the

25  purpose of going to a bar and not necessarily for the purpose

ALEXANDER BILLIOUX - DIRECT

1  of going to a restaurant that had a bar?

2          **THE WITNESS:**  Yes, sir.

3          **THE COURT:**  Is that a fair statement?

4          **THE WITNESS:**  Yes, Your Honor.

5          **THE COURT:**  Go ahead, Counsel.

6  **BY MR. FAIRCLOTH:**

7  **Q.**  Doctor, you would agree that as we sit here today, there

8  are still bars open in the state of Louisiana?  Would you agree

9  with that?

10  **A.**  Yes.

11  **Q.**  You have closed some of the bars but not all of the bars.

12  You would agree with that?

13  **A.**  I believe so.

14  **Q.**  That distinction was made based on the permitting

15  distinction between the bars, correct?

16  **A.**  Yes.

17  **Q.**  Do you have any understanding of what that permitting

18  distinction is for?

19  **A.**  Yes.  So, again, if the permit allowed the bar to operate

20  as a restaurant primarily, my understanding is that they can

21  continue to operate as a restaurant even under that permit as a

22  bar that serves food.

23  **Q.**  I'm asking, the distinction between the AR and AG permit,

24  what's the purpose of that distinction under the permitting

25  regime?  Do you know?

ALEXANDER BILLIOUX - DIRECT

1   **A.**   So I believe the difference is the ability to operate as a
2   restaurant during daily hours and then a bar in the evening,
3   with the interest of being able to serve a broader customer
4   base.  For instance, restaurants are allowed to have children
5   whereas bars are not.
6   **Q.**   That regime has nothing to do with any of the activities
7   you have described in your affidavit as contributing to the
8   transmission of coronavirus.  Do you agree with that?
9   **A.**   I'm not sure.  What I would say is that if a building --
10  if an establishment is operating as a restaurant, then I think
11  that they are a lower risk than as a bar.  My understanding is
12  that these, a group that are permitted conditionally to change,
13  operate as a restaurant, which is a lower risk setting, up to a
14  certain hour and then would normally switch to a bar, and they
15  are no longer allowed to switch to a bar in the evenings.
16          **THE COURT:**  Counsel, you are about to run out of
17  time.
18          **MR. FAIRCLOTH:**  Yes, sir.  I understand, Your Honor.
19  Let me check my notes, Your Honor.  I may be done.
20  **BY MR. FAIRCLOTH:**
21  **Q.**   Doctor, the restaurant conditional permits, there's been a
22  lot of those that AG bar owners have applied for in the last
23  couple of weeks; is that correct?
24  **A.**   I'm not as familiar with those because those are submitted
25  to ATC.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   Are there restaurant conditional permits that are being
2  issued to bar owners?  Is that happening?
3  **A.**   I don't know, again, because that goes through ATC.
4  **Q.**   Do you know whether or not any of the activities that
5  contribute to the spread of COVID form a basis for getting a
6  restaurant conditional permit?  In other words, if a bar owner
7  with an AG permit wants to get a restaurant conditional permit,
8  do they have to do anything with regard to their activities
9  that has anything to do with COVID?
10 **A.**   Yes, sir.  I believe that they are limited to occupancy
11 levels associated with a restaurant when they are operating as
12 a restaurant rather than as a bar.  I think that the state fire
13 marshal makes a distinction on the occupancy levels based on
14 whether you're bar or a restaurant.  The square footage
15 associated with a bar's occupancy is based on, I believe,
16 standing room whereas a restaurant is based on seated only.
17 **Q.**   You would defer to whatever the law is in that regard, I
18 assume?  Whatever the regulations say, you would defer to that?
19 **A.**   Yes.
20 **Q.**   Have you visited with any bars since the orders were
21 issued to see what is the actual in the field activity at
22 restaurant bars as a result of the order?
23 **A.**   I personally have not, but our teams have: the state fire
24 marshal, our LDH sanitarians, and ATC, I believe.
25           **MR. FAIRCLOTH:**  One short line left, Your Honor.

ALEXANDER BILLIOUX - DIRECT

1    BY MR. FAIRCLOTH:

2    Q.    You have explained, I think, at some of the press

3    conferences -- it may be in your declaration -- that the data

4    that is showing that trend lines are improving you believe

5    supports the closure of bars.  Have you said something like

6    that?

7    A.    I do, including as well the mask mandate and the reduction

8    in number of people allowed at a social gathering.

9    Q.    Other red states, many red zone states, did not close

10   bars; they instead regulated activities.  Would you agree with

11   that?

12   A.    Some, yes.

13   Q.    Those very same states, they also have an improvement in

14   their trend lines.  In other words, their numbers are getting

15   better, correct?

16   A.    I would have to know about the specific states you are

17   talking about, but I would say in general with mandating

18   masking and reducing social gatherings, which most of us in the

19   Sunbelt have done, we are all seeing improvements.

20   Q.    I will give you an example.  Mississippi is a red zone

21   state.  Bars could only sell to seated customers and they had

22   an 11:00 p.m. closing time.  Their numbers are improving.  Are

23   you aware of that?

24   A.    I am.

25   Q.    So that would actually undermine your assumption that your

ALEXANDER BILLIOUX - DIRECT

1   improving numbers are related to closure of bars, wouldn't it,
2   or at least it runs counter to it?
3   **A.**   Go ahead, Counsel.  Sorry.
4   **Q.**   The same thing for Missouri.  Missouri was a red zone
5   state.
6        **MR. BLOCK:**  Your Honor, I'm going to object.  He
7   needs to allow the witness to answer the question.
8        **MR. FAIRCLOTH:**  I apologize.  I was just hurrying,
9   Your Honor.  I'm sorry.
10       **THE COURT:**  The objection is sustained.  I'm not
11   interested in what happens in Missouri, even though I'm from
12   there, or in Mississippi.  I'm interested in the rationale for
13   the distinction that the governor of Louisiana made, what the
14   data was based on, and whether it survives the *Jacobson/Abbott*
15   test.  Counsel, I will give you a couple more questions and
16   then your time is up.
17       **MR. FAIRCLOTH:**  Your Honor, I think I have probably
18   gone as far as I can with this witness on that particular
19   issue.  I would at this time have no additional questions for
20   this witness.
21       **THE COURT:**  Thank you.
22           Mr. Garner.
23       **MR. BLOCK:**  Your Honor, this is Matthew Block.  I'm
24   going to handle Dr. Billioux.  Normally I would defer calling
25   Dr. Billioux to the defendants' case, but at this point in

ALEXANDER BILLIOUX - DIRECT

1  time, given where we are, I will go ahead and handle
2  Dr. Billioux --
3          THE COURT:  Thank you.
4          MR. BLOCK:  -- if it's okay with you.
5          THE COURT:  Sure.
6          MR. BLOCK:  One housekeeping question.  We are in a
7  sort of strange dynamic where Dr. Billioux was called as a
8  witness without being qualified as an expert.  I certainly
9  intended to tender Dr. Billioux as an expert in the field of
10  internal medicine and public health.  His CV is attached as
11  Exhibit 12.  I would like to do that.  I'm happy to go into his
12  qualifications if you believe or Mr. Faircloth believes that's
13  necessary.
14          MR. FAIRCLOTH:  No objection.
15          THE COURT:  So ordered.  Go ahead.
16                    DIRECT EXAMINATION
17  BY MR. BLOCK:
18  Q.   Dr. Billioux, I want to back up a second here, and I want
19  to make sure I understand what your opinions are about the bar
20  closures.
21          Would it be fair to say that you are the governor's
22  primary medical advisor for the response to the COVID-19
23  pandemic?
24  A.   Yes, sir.
25  Q.   In terms of your communication with the governor, the

ALEXANDER BILLIOUX - DIRECT

1   governor directly, can you just briefly tell the Court about

2   the amount of communication and what level of communication you

3   have had with the governor since the beginning of this

4   pandemic.

5   A.   Yes.  We communicate daily, sometimes multiple times a

6   day.  I communicate sometimes just to update on cases, trends

7   and data, other times either to offer advice or insights that

8   we are seeing from the data or to answer questions the governor

9   has about what he is seeing in the data or anything related to

10  COVID.

11  Q.   Does the governor, in your experience, just say, "Look,

12  Dr. Billioux, whatever you suggest is what I'm going to do," or

13  does he interrogate you about what the data showed?

14  A.   Yeah, it's the latter.  He certainly takes what I say from

15  a public health perspective, but I know him to also reach out

16  to other input for what action should be taken.

17  Q.   You are anticipating my next question.  So, Dr. Billioux,

18  are you the only medical advisor that has had contact with the

19  governor throughout this pandemic on advice about the measures

20  that should be taken to respond to COVID-19?

21  A.   No.

22  Q.   Can you briefly tell the Court about the process that you

23  have gone through with the governor before an additional step

24  would be taken, whether it would be the steps to implement

25  mitigation measures, whether it be the stay at home order, the

1  current order we are talking about, or the measures to go into

2  Phase One or Phase Two.

3  A.    We generally do that in the context of a meeting with the

4  governor, his executive team as advisors, and then members from

5  my team, the Office of Public Health, LDH in general, and also

6  with external public health advisors, the deans of the School

7  of Public Health in New Orleans and epidemiologists.

8              We go over data initially to describe the trends that

9  we are seeing, answer questions the governor may have about

10  those, and then make specific points or analyses on that

11  data -- for instance, the data around, say, bars and

12  restaurants -- and take his questions throughout.  Usually I

13  end with a public recommendation of actions.

14  Q.    Now, Dr. Billioux, I'm going to show you a document.  It's

15  No. 36.  I'm sorry.  We had this in order, but I'm going to

16  skip around just so we can do this more expeditiously.

17              So, Dr. Billioux, this is an exhibit you are familiar

18  with, is it not?

19  A.    Yes, sir.

20  Q.    So can you tell the Court just briefly what this document

21  is.

22  A.    So this is a presentation given to the governor with an

23  update on what we call the gating criteria.  These are specific

24  metrics that we track to describe the process or the progress

25  of the COVID epidemic in the state.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   Can you just explain, as we are going through this
2  document, to the Court what this document reflects.
3  **A.**   So here we are reflecting down to the public health
4  regional level and parish level the rate of new case
5  development in these different areas, darker red being many
6  more cases per capita being reported, 100,000 in this case,
7  lighter colors being less.
8  **Q.**   The timing of this report was what, Dr. Billioux?
9  **A.**   So the timing of this presentation is the 22nd.  This
10 report reflects cases from, it says, the 3rd of June to the
11 17th of June.
12 **Q.**   So this was June 22?
13 **A.**   Yes.  The presentation was June 22.  The period of
14 reporting for these incident cases was June 3 through 17, that
15 two-week period.
16 **Q.**   So at this point, June 22, when you are making this
17 presentation to the governor, tell us what your concerns were
18 as a public health official, in your role as advisor to the
19 governor, and what you shared with the governor about your
20 concerns.
21 **A.**   So as I noted, we do these presentations with some
22 frequency for the governor.  In this one what we were seeing
23 was this progress of the state becoming increasingly dark red,
24 meaning very high incidence, meaning in more and more places in
25 the state we were seeing high levels of new cases being

ALEXANDER BILLIOUX - DIRECT

1  detected.  So the concern was that we were starting to lose
2  control over the epidemic.
3  **Q.**   Again, this is June 22, correct?
4  **A.**   Yes.
5  **Q.**   Did the governor agree immediately with your
6  recommendations of what should be done on June 22?
7  **A.**   He did not.
8  **Q.**   What did he ask you at that point in time, on June 22?
9  **A.**   We expressed concerns about bars and masking and other,
10  you know, large gatherings -- or gatherings below 250 but still
11  that we were able to associate with outbreaks.  He was
12  concerned that enforcement had not been adequate up to that
13  point of the existing restrictions and felt before he could
14  take an action to further restrict those activities, he needed
15  to see more robust enforcement of those activities.
16  **Q.**   So then two weeks later, July 11, when the governor
17  announced the order that we are here about today in court, what
18  happened over that two-week period or little more than two
19  weeks from June 22 when you made this presentation?
20  **A.**   A significant increase in enforcement visits and notably
21  not a lot of the sites failing to meet the enforcement
22  requirements, meaning lots of visits to bars but not bars being
23  felt to not be meeting our rigor.
24  **Q.**   What happened to your concerns about what the state was
25  looking like for the amount of COVID infections that you were

ALEXANDER BILLIOUX - DIRECT

1   seeing?

2   **A.**   Yeah.   Apologies.   No, well, certainly our concern was

3   rising.   Not only were we seeing more cases and essentially

4   this map turned fully red, deep red, but importantly we were

5   seeing critical limitations in hospital beds available for all

6   patients, not just COVID patients.

7          We knew that any decision that's made to impact COVID

8   spread takes two weeks before we are going to see those

9   effects.   We were significantly concerned that if we didn't act

10  soon, by the time we would act, it would be too late to act to

11  avoid hospital [Zoom audio glitch].

12          **THE COURT:**   Doctor, what led to the distinction

13  between bars and restaurants?   Did any of this data on June 22

14  have anything to do with separating out bars and restaurants?

15          **THE WITNESS:**   Yes, sir.   Your Honor, we did talk

16  about the outbreak clusters as I described, looking at the

17  difference between bars and outbreaks associated or cases

18  associated with those outbreaks and restaurants and the cases

19  associated with restaurants.

20          **THE COURT:**   You did that on the basis of interviewing

21  people?

22          **THE WITNESS:**   Both contact tracing and reports, yes,

23  Your Honor.

24          **THE COURT:**   Thank you.

25          **MR. BLOCK:**   Your Honor, you anticipated my very next

ALEXANDER BILLIOUX - DIRECT

1  question because I'm now going to go to Document 38, please.

2  BY MR. BLOCK:

3  **Q.**   Dr. Billioux, this is a document that I'm reading, and it

4  says "Cases Over Time for Age Groups," correct?

5  **A.**   Yes.

6  **Q.**   So basically what this document does is it reflects number

7  of cases broken down by age?

8  **A.**   Yes.

9  **Q.**   So this was also documenting -- this runs through July 16,

10  I believe, but this presentation or at least this discussion

11  was part of the discussion that occurred with the governor

12  before he issued Proclamation No. 89 about bars, was it not?

13  **A.**   Yes.  We showed him graphs like this at various time

14  points.

15  **Q.**   What is it about this document in particular that gave you

16  concern about bars in particular?

17  **A.**   Yeah.  So the greatest concern was that if we compared the

18  beginning of the outbreak, which is at the left-hand side of

19  this graph, we see that cases across age groups rose together

20  and fell together.  As we moved towards the end of Phase One

21  and into Phase Two, we saw that one age group in particular

22  broke off and had a very steep rate of rise compared to the

23  other age groups and that was the 18- to 29-year-olds.

24          Subsequently we see other age groups rise, and the

25  concern was the specific risks around the new activities that

ALEXANDER BILLIOUX - DIRECT

1    were added in Phase Two and bars being prominent amongst them.
2    This was around the same time -- shortly, actually, after going
3    into Phase Two when we had the Tigerland episode, and we
4    started to see mounting cases in contact tracing for that age
5    group related to bars.
6    Q.   So is it fair to say, then, that your opinion at this time
7    from this document -- just talking about this document in
8    particular, is that one of the concerns you had was about young
9    people in bars in Phase Two?
10   A.   Yes.
11   Q.   Can you go to page 4 of this document.
12            THE COURT:  Wait.  Excuse me, Counsel.
13            MR. BLOCK:  Yes, sir.
14            THE COURT:  So this chart, this graph, the one with
15   the high spike on the yellow line, was based upon data which
16   you shared with the governor about this age group in bars and
17   restaurants; is that correct?
18            THE WITNESS:  Yes, sir.  This is for all activities,
19   all ages, but yes, sir.
20            THE COURT:  Right.  Thank you.
21   BY MR. BLOCK:
22   Q.   Dr. Billioux, to follow up on what the judge was just
23   asking you, this particular data set regarding age groups, this
24   was part of the presentation that you made to the governor
25   involving the recommendations about bar closures, was it not?

ALEXANDER BILLIOUX - DIRECT

1   A.   Yes.

2   Q.   This data in particular was one of the data sets that led

3   you to believe there was a concern about young people in bars

4   in Phase Two?

5   A.   Yes, sir.

6           THE COURT:  This is Exhibit what?

7           MR. BLOCK:  This is Exhibit 38, Your Honor.

8           THE COURT:  Thank you.

9   BY MR. BLOCK:

10  Q.   Go to page 4 of this document.  Dr. Billioux, a lot of the

11  bars we are looking at in this litigation are from the

12  Terrebonne and Lafourche area.  What medical region or public

13  health region in the state are Lafourche and Terrebonne

14  parishes in?

15  A.   In Region 3, South Central.

16  Q.   Region 3 is what we are looking at right here.  There is a

17  pronounced spike, is there not, in that same age group in this

18  region where most of the bars from this litigation are?

19  A.   Yes.

20  Q.   That same 18- to 30-year-old group or 18 to 29?  Excuse

21  me.

22  A.   Yes.

23  Q.   Now, Dr. Billioux, I want to be very clear about this.

24  From the time of June 22 until the time where the governor

25  announced this order on July 11, was it your recommendation to

ALEXANDER BILLIOUX - DIRECT

1   the governor that there be bar closures to reduce the spread of
2   this virus in line with the spikes you were seeing that you
3   just discussed with the Court?
4   A.   Yes.
5   Q.   That was based on your public health opinion, was it not?
6   A.   Yes.
7   Q.   Was it your opinion alone that was presented to the
8   governor?
9   A.   No.
10  Q.   If you can just briefly discuss some of the names that
11  were involved in that formulation of that opinion and
12  recommendations to the governor.
13  A.   So in addition to my acting state epidemiologist,
14  Theresa Sokol, whose team gathers a lot of this data, we also
15  had, as I noted, external epidemiologists as well: Dr. Susan
16  Hassig of Tulane University; Dr. Susanne Straif-Bourgeois of
17  LSU; the deans of LSU School of Public Health and Tulane School
18  of Public Health, Dean Smith and Dean [Zoom audio glitch]; and
19  then Dr. Katie O'Neal, the chief medical officer of Our Lady of
20  the Lake.
21  Q.   Dr. Billioux, there's an affidavit from Dr. Robert Hart,
22  who's the chief medical officer at Ochsner, that has been
23  submitted in this case.  Is Dr. Hart one of the people that you
24  have had consultation with about these orders as well?
25  A.   Yes.  He was not in this meeting, but I speak frequently

ALEXANDER BILLIOUX - DIRECT

1    with Dr. Hart, and he has expressed concerns.

2    Q.    So, Dr. Billioux, in addition to those experts on the

3    state level, can you tell the Court about your communications

4    and the governor's communications, to the extent that you are

5    aware, with the federal public health officials.

6    A.    Certainly.  The governor has a regular call with the

7    White House, convened by the vice president, attended by

8    multiple members of the administration and prominently

9    individuals from the Department of Health and Human Services,

10   including Ambassador Deborah Birx, Admiral Brett Giroir,

11   Dr. Tony Fauci, and others.

12          They often, especially Ambassador Birx, will talk

13   about state level data.  We get state level data reports, and

14   they give recommendations in general to the states and to the

15   governors to communicate and act on for their states on

16   measures that can be taken to mitigate the spread of COVID.

17   Q.    Let's go to 14.  Now, Dr. Billioux, just to be clear,

18   because there was a tiny bit of feedback here -- I heard it,

19   but I want to make sure that it was clear.

20          You said there are weekly calls with this team of

21   officials, including Dr. Birx and others?

22   A.    Yes, sir.  And the vice president.

23   Q.    You participate in those or at least you are in the room

24   with the governor participating in those calls, correct?

25   A.    Yes.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   Now, this is a document which is Document 14, I believe,

2  if you can tell the Court briefly what this document is.

3  **A.**   So this is a weekly report of data compiled by the

4  White House Coronavirus Task Force and then sent in advance of

5  these meetings to the states.  This one is for Louisiana.  What

6  we have here is the front page that's on every report that

7  gives a summary of what the White House Coronavirus Task Force

8  says is the status of our epidemic and then specific

9  recommendations for the governor and his team to enact in order

10 to address the epidemic.

11 **Q.**   Do you only get written communications or are their

12 recommendations that are given in these phone calls as well

13 that you participate in?

14 **A.**   No, it's certainly both.

15 **Q.**   Now, on this document, Exhibit 14, which is dated July 14,

16 the day after this order became effective, the White House is

17 recommending for Louisiana -- correct?  This is a specific

18 recommendation for Louisiana?

19 **A.**   (Nods head.)

20 **Q.**   The White House is recommending -- and it's the fourth

21 bullet point down in the recommendations -- to close bars and

22 gyms, correct?

23 **A.**   That's correct.

24 **Q.**   Now, it says in hot spot parishes.  Under your

25 understanding of Louisiana at the time, in your opinion how

ALEXANDER BILLIOUX - DIRECT

1    many hot spot parishes did we have in Louisiana back in the
2    middle of July?
3    **A.**    At the time of this communication, I believe we had all of
4    our parishes as hot spots maybe save three, depending on the
5    timing.
6    **Q.**    Now, if you go later in this document, it talks about some
7    parishes in the red zone, some parishes in the yellow zone, so
8    there's a distinction in this document between red zone and
9    yellow zone parishes.  In your recommendations for the
10   governor, did you believe that all of the parishes met the
11   definition of what is called a hot zone or high prevalence of
12   COVID-19?
13   **A.**    Yes.  That was echoed by Dr. Tony Fauci who said just
14   because you are in a yellow zone, you should understand you
15   need to take the same actions now in order to avoid being in a
16   red zone next time the data come around.
17   **Q.**    Go to page 4 of this document.  So, Dr. Billioux, this is
18   now page 4 of that same document.  Under recommendations for
19   counties in the red zone -- obviously the one thing that's not
20   specific to Louisiana about this is that it says "counties" at
21   the top, but again specific for Louisiana there's a
22   recommendation for public officials to close bars, is it not?
23   **A.**    There is.
24   **Q.**    Was this recommendation that was received in writing on
25   July 14 consistent with the advice that was being given by

ALEXANDER BILLIOUX - DIRECT

1    Dr. Birx and the other members of the Coronavirus Task Force
2    prior to July 14?
3    **A.**   Yes.
4    **Q.**   Again, this document is the day after the governor's order
5    came into effect?
6    **A.**   Yes.
7           **THE COURT:**  Counsel, this is Exhibit 38?
8           **MR. BLOCK:**  No, sir.  This is Exhibit 14, Your Honor.
9           **THE COURT:**  Thank you.
10   BY MR. BLOCK:
11   **Q.**   Dr. Billioux, I want to now get into this discussion about
12   what is a bar and what is not a bar, because there was a whole
13   lot of discussion about that.  I want to talk about Exhibit 45.
14           Dr. Billioux, you were asked about this document, but
15   you were not shown this document during Mr. Faircloth's
16   examination.  Are you familiar with this document that we are
17   looking at right here?
18   **A.**   Yes.
19   **Q.**   What is it?
20   **A.**   So this is OpenSafely guidance that's on the state fire
21   marshal's website for in this case restaurants, cafes, coffee
22   shops, bars, nightclubs, and microbreweries.
23   **Q.**   Have you been involved with the development of this
24   guidance?
25   **A.**   Yes.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   I want to go down to page 3, the very bottom of page 3.
2  Now, there was a lot of discussion about how bars, bar areas in
3  restaurants, are operating under the current structure.  Do you
4  remember those questions from Mr. Faircloth?
5  **A.**   I do.
6  **Q.**   Now, this guidance that we are looking at is dated
7  July 12, which is the day after the governor announced the
8  order we are looking at.  It says that this is now guidance for
9  bar areas of restaurants, is it not?
10  **A.**   It is.
11  **Q.**   Are you familiar with this guidance and how it was
12  developed?
13  **A.**   Yes.
14  **Q.**   This guidance which says, "Bar areas of restaurants shall
15  be used for seating/serving purposes only and shall not allow
16  for social gatherings.  Service in bar areas must include food
17  items," why was this important to you?
18  **A.**   Because, again, we wanted to emphasize the need to operate
19  as a restaurant, as a lower risk setting than as a bar, so
20  making the distinction between activities associated with a
21  restaurant -- seating, being primarily for food -- versus going
22  to a bar, which can include a lot of socialization and
23  circulation.
24             **THE COURT:**  Is this Exhibit 4, Counsel?
25             **MR. BLOCK:**  No, Your Honor.  This is Exhibit 45, I

ALEXANDER BILLIOUX - DIRECT

1  believe.

2          THE COURT:  Thank you.

3  BY MR. BLOCK:

4  Q.   So when Mr. Faircloth says there are bars that are

5  operating as bars right now, is that consistent with this

6  guidance?

7  A.   No.

8  Q.   Why not?

9  A.   Sorry?

10  Q.   Dr. Billioux, you have to speak up a tiny bit.

11  A.   Sorry.  Maybe I'm leaning back too far.

12          No, it is not true.  And this guidance says that if a

13  bar wants to act as a restaurant under their permit, they must,

14  as long as they don't act as a bar.  That's my interpretation

15  of it.

16  Q.   So if a restaurant is to follow this guidance, then is it

17  something that is permissible for me and ten of my friends to

18  go into a bar, a bar space in a restaurant, and have drinks for

19  two to three hours one night?  Is that consistent with --

20  A.   Not under this guidance, no.

21          MR. FAIRCLOTH:  Objection, Your Honor.  He objected

22  to me asking the very same witness about the legal effect of

23  this order, and now that's exactly what he is doing.

24          THE COURT:  Sustained.

25

ALEXANDER BILLIOUX - DIRECT

1    BY MR. BLOCK:

2    Q.   Dr. Billioux, are you familiar with the governor's orders,

3    the actual documents that were prepared and submitted and

4    signed by the governor implementing these orders?

5    A.   Yes.

6    Q.   So I'm going to show you now Exhibit 10, 2(G).  This is

7    No. 74, which is the renewal of the order on the bar closures,

8    so if you can go to Section 2(G).  This is an order from the

9    governor, is it not?

10   A.   Yes.

11   Q.   It says here in Section (e) that any business operating

12   pursuant to this subsection shall follow the guidance from the

13   state fire marshal published at opensafely.gov.  When

14   Mr. Faircloth was asking you legal questions about whether or

15   not it was enforceable or not, the governor in his order is

16   saying that people need to follow the guidance, correct?

17   That's what it says here.

18   A.   That's my understanding.

19   Q.   Let's talk about this issue of contact tracing because I

20   want to just briefly discuss that.  I know it was discussed at

21   length with your questions from Mr. Faircloth.  If you can go

22   now to --

23   A.   Can you hear me?  Sorry.  My internet seemed to pause.

24   Q.   Can you hear us, Dr. Billioux?

25          MR. BLOCK:  Judge, it looks like we lost Dr. Billioux

ALEXANDER BILLIOUX - DIRECT

1   for a second.

2           THE WITNESS:  Sorry.  I'm having connectivity issues.

3           THE COURT:  Are you back, Doctor?

4           THE WITNESS:  Can you hear me?

5           THE COURT:  I can hear you.

6   BY MR. BLOCK:

7   Q.   Dr. Billioux, Exhibit 34 is just a different formatted

8   version of what you were shown by Mr. Faircloth.  Is that fair?

9   A.   Yes, I believe so.  It looks like it might be a different

10  date just given the number of cases is different.

11  Q.   So in the lawsuit that was filed by Mr. Faircloth, in

12  paragraph 40 it says the following:  "At that time plaintiffs

13  were among the thousands of bars throughout the state from

14  which only .45 percent of all known cases of COVID-19 may have

15  been transmitted."  Then it goes on to say:  "According to the

16  governor's own data, 99.5 percent of known COVID-19 cases were

17  transmitted from elsewhere."

18          THE WITNESS:  Sorry, Your Honor.  I'm turning off my

19  camera because I think that's making my internet connection

20  harder --

21              Counsel, can you repeat the question?

22          MR. BLOCK:  Your Honor, is that okay that

23  Dr. Billioux has turned off his camera?  He thinks that's

24  causing a problem here.

25          THE COURT:  As long as he can answer the question.

ALEXANDER BILLIOUX - DIRECT

1    Pose the question again.
2    **BY MR. BLOCK:**
3    **Q.**   So in paragraph 40 of the complaint that was filed by
4    Mr. Faircloth it says:  "At that time plaintiffs were among the
5    thousands of bars throughout the state from which only
6    .45 percent of known cases of COVID-19 may have been
7    transmitted.  According to the governor's own data,
8    99.5 percent of known COVID-19 cases were transmitted from
9    elsewhere."
10            So what Mr. Faircloth is saying is that only .5 of
11   the total cases were transmitted from bars.  Is that a correct
12   statement?
13   **A.**   No.  Can you hear me?
14   **Q.**   I can hear you now, Dr. Billioux.
15   **A.**   I said no.  I'm sorry.
16   **Q.**   I can hear you fine now.  So why is that not correct, what
17   was said in the petition?
18   **A.**   I'm sorry.  It's not correct -- it certainly is correct to
19   say that of the cases we have been able to link to an outbreak
20   that that small proportion -- that they represent that small
21   proportion of the total cases.  The converse is not true
22   because we don't know for a fact that they weren't linked to
23   bars.  We don't have that information.
24   **Q.**   So if there's some attempt to say that because 41 out of
25   254 outbreaks are tied to bars, to say that there are only 41

ALEXANDER BILLIOUX - DIRECT

1   outbreaks that are a result of contact in bars, that would be
2   an incorrect conclusion?
3   **A.**   (No response.)
4             **THE COURT:**  Doctor, can you hear?
5                   I don't think he can hear us.
6                   Dr. Billioux, can you hear us?
7             **THE DEPUTY CLERK:**  I don't see Dr. Billioux anymore
8   on Zoom.
9             **MR. BLOCK:**  Your Honor, tell me how you would like to
10  handle this.
11            **MR. GARNER:**  Can we have Dr. Billioux call in by
12  telephone?
13            **THE COURT:**  Can we try to reconnect with him?
14            **MR. BLOCK:**  I'm sure he is furiously trying to
15  reconnect, Your Honor.
16            **THE COURT:**  Cherie, do you know if he is trying to
17  come back in?
18            **THE DEPUTY CLERK:**  I don't see him yet coming up on
19  the participant screen.  Let me see.  Hold on.
20                   I see him now.  Hold on.
21            **THE COURT:**  Counsel, I apologize for all this.  In
22  another hearing last week, I observed that I would rather be in
23  my courtroom than my living room, and this simply proves that
24  we are presently being run by a bunch of idiots.
25            **MR. GARNER:**  Judge, Jim Garner.  I would rather be in

ALEXANDER BILLIOUX - DIRECT

1  your courtroom as well.

2          **MR. BLOCK:**  I was just trying to figure out how

3  Mr. Faircloth was able to get through his whole examination

4  without any problems and I'm not able to do the same.

5          **THE COURT:**  Cherie, any news?

6          **THE DEPUTY CLERK:**  I see Dr. Billioux on the screen,

7  but I'm not sure if he can hear us or he can comment back.

8          **THE COURT:**  Doctor, can you hear us?

9               So how does he reconnect?

10         **THE DEPUTY CLERK:**  Does anybody have a number for

11  Dr. Billioux that I can contact him?

12         **MR. BLOCK:**  I do.

13         **THE DEPUTY CLERK:**  Okay.

14         **MR. BLOCK:**  I'm a tad hesitant.  I know we have a lot

15  of people that are watching this publicly.  I'm a tad hesitant

16  to give out Dr. Billioux's --

17         **THE DEPUTY CLERK:**  Oh, true.

18         **MR. BLOCK:**  -- cell number.

19         **THE DEPUTY CLERK:**  Sure.  Hold on.

20         **MR. BLOCK:**  It's going to be sent to you via private

21  chat.  I'm not sure what that means.

22         **THE DEPUTY CLERK:**  Yes.  Thank you.

23         **THE COURT:**  While we are waiting, is there going to

24  be any other witness?  Because we are running short of time

25  anyway.

ALEXANDER BILLIOUX - DIRECT

1          **MR. BLOCK:**  Your Honor, Dr. Billioux was going to be

2   the governor's only witness.  So subject to the introduction of

3   the other exhibits, that was going to be the only live witness

4   we had.

5          **THE WITNESS:**  Can you hear me?

6          **THE DEPUTY CLERK:**  Dr. Billioux, are you on right

7   now?

8          **THE WITNESS:**  I am.  Can you hear me on the phone?

9          **THE COURT:**  Yes.

10         **THE DEPUTY CLERK:**  Yes, sir.

11         **THE WITNESS:**  Sorry.  I'm calling you from my phone

12  because the computer internet was unstable.  Apologies.

13         **THE COURT:**  The bureaucrats who determine the

14  computer internet are unstable, in the Court's opinion, but

15  that's neither here nor there.

16              Go ahead, Counsel.

17         **MR. BLOCK:**  Thank you, Your Honor.

18  BY MR. BLOCK:

19  **Q.**   So, Dr. Billioux, I think where we left off, I just want

20  to -- since we were having connectivity issues, I just want to

21  make sure this part was clear.

22              So when the petition alleges that only .5 percent of

23  all the cases are related to bars, that is not what this

24  document and your data show, correct?

25  **A.**   That's correct.  It does not show that.

ALEXANDER BILLIOUX - DIRECT

1  **Q.**   What it shows is of the number of outbreaks that have been
2  identified through contact tracing -- so a total of 254 -- 41
3  have been as a result of bars, correct?
4  **A.**   That's correct.
5  **Q.**   But we know, do we not --
6            **THE COURT:**   41 what?
7            **MR. BLOCK:**   41 out of 254, Your Honor, and this is
8  Exhibit 34.
9            **THE COURT:**   Okay.  Thank you.
10 **BY MR. BLOCK:**
11 **Q.**   But we know, Dr. Billioux, do we not, that we have had
12 lots more than 254 outbreaks, correct?
13 **A.**   Yes.
14 **Q.**   You have just not been able to -- and I say "you."  Your
15 team and the contact tracing being done on behalf of LDH has
16 not been successful in being able to identify other sources of
17 outbreaks, whether that's because the individuals did not
18 report it to you or you just were unable to make that
19 connection.  Is that fair to say?
20 **A.**   That's correct.
21 **Q.**   Now, Dr. Billioux, I want to get into the whole point of
22 contact tracing.  Is the point of contact tracing to be able to
23 generate a report like this for you?  Is this the end goal of
24 what contact tracing is for?
25 **A.**   No.

ALEXANDER BILLIOUX - DIRECT

1   **Q.**   What is the purpose of contact tracing?

2   **A.**   Well, the goal of contact tracing -- there's several

3   goals:

4          One is to identify who else might be at risk related

5   to a case that's identified of COVID, meaning who else might

6   have been exposed to COVID that needs to monitor for symptoms

7   and quarantine themselves to reduce the likelihood that they

8   themselves become infectious and infect others.

9          The other goal is to get support to those people

10   themselves who are cases, meaning guidance on isolating and

11   protecting their families.

12          And, thirdly, to provide us information about

13   settings like this to understand the dynamics of spread of

14   COVID across the state in a variety of settings.

15   **Q.**   So if I receive a contact tracing call and it tells me

16   that it's asking questions of me, they are going to ask about

17   the social activity I had for what period of time,

18   Dr. Billioux?

19   **A.**   So we will ask for the period of time 48 hours before

20   symptoms became known to the individual through to the time

21   that they isolate.

22   **Q.**   So then what I would do with you -- and I realize you are

23   not making the contact tracing calls yourself, but let's assume

24   for a second that you are.  If you contact me and you're going

25   through this, I am then to tell you what social activities I

ALEXANDER BILLIOUX - DIRECT

1    had where I interacted with other people in that time period,
2    correct?
3    A.   That's correct.
4    Q.   So if I then tell you, Dr. Billioux, I went to Chili's,
5    the restaurant Chili's, if I went to Chili's a day before I
6    became symptomatic, what happens then?
7    A.   We would want to know a little bit more about what you did
8    at Chili's.
9    Q.   Okay.  If I said I had close contact with other
10   individuals at Chili's, then what would happen?
11   A.   Well, we would try to understand if we can identify those
12   individuals, for instance, were they a part of your party at
13   the restaurant, and then do you have contact information for
14   them.  Then we would reach out to them and inform them that
15   they may have been exposed to someone with COVID and give them
16   recommendations to quarantine.
17   Q.   The only way, then, that infection, my infection would
18   show up on this sheet, an outbreak, is if more than one
19   individual, meaning me plus somebody else, was able to show
20   that we were together at Chili's and then had an outbreak after
21   that, that we both became positive after that, correct?
22   A.   That's right.  You would have to be a case, meaning have
23   an actual test result, to be on this list.
24   Q.   Okay.
25   A.   It would have to be at least two.

1   **Q.**   I'm sorry.  Go ahead.  I didn't mean to interrupt you.

2   **A.**   No, I was just saying it would have to be at least two.

3   For an outbreak, it has to be two or more individuals linked in

4   space and time.

5           **THE COURT:**  Excuse me.  Let me interrupt.  Chili's is

6   a restaurant.  How would you treat the information that the

7   virus got caught at a restaurant as opposed to a bar?  The

8   example given to you is not a bar.  It's a restaurant.

9           **THE WITNESS:**  So the way that we train our contact

10  tracers, Your Honor, is if the individual told us, "We went to

11  Chili's and hung out at the bar for several hours and then went

12  home," we would treat that as a bar.  If somebody said, "I went

13  to dinner with my friends at Chili's," then it would be treated

14  as a restaurant.

15          **MR. BLOCK:**  Your Honor, are you okay?  I didn't want

16  to interrupt any other questions you have of him.

17          **THE COURT:**  Yes.

18  **BY MR. BLOCK:**

19  **Q.**   Now, Dr. Billioux, under the guidance that we just talked

20  about -- and if we can go back to 45.

21          **THE COURT:**  What's your question?

22  **BY MR. BLOCK:**

23  **Q.**   My question is:  Chili's has a bar area.  I'm not trying

24  to pick on Chili's here.  A restaurant like Chili's has a bar

25  area, does it not?  I'm not sure if you are familiar with

ALEXANDER BILLIOUX - DIRECT

1    Chili's, Dr. Billioux, but it has a bar area, correct?

2    **A.**   I am and I do believe so, yes.

3    **Q.**   Under the current guidance that has been in place since

4    July 12, can Chili's operate their bar area like a bar?

5    **A.**   No, I don't believe so.

6         **MR. FAIRCLOTH:**  Same objection, Your Honor.  It's

7    interpreting the law again.

8         **THE COURT:**  Overruled.

9    **BY MR. BLOCK:**

10   **Q.**   This guidance that we are looking at here at the bottom,

11   which is on Exhibit 45, says that the bar areas of restaurants

12   are only to use the seating areas at bars for food service and

13   it must contain food service, correct?

14   **A.**   Yes.

15   **Q.**   So right now the bar at Chili's, the bar space at Chili's,

16   does not operate like it did prior to the pandemic, correct?

17        **MR. FAIRCLOTH:**  Objection, Your Honor.

18        **THE WITNESS:**  It should not.

19        **MR. FAIRCLOTH:**  It's a legal opinion and it's wrong

20   factually too.

21        **THE COURT:**  Overruled.  Answer the question.

22   **BY MR. BLOCK:**

23   **Q.**   Dr. Billioux, you can answer the question.

24   **A.**   Oh, I'm sorry.  I did.  I said it should not.

25   **Q.**   Now, we talked about the concerns you had that you

ALEXANDER BILLIOUX - DIRECT

1   developed from the contact tracing information.  We talked
2   about the concerns you had about the age group data that was
3   seen post the reopening of bars in Phase Two.  What other
4   concerns did you have about bars in particular that caused you
5   to make the recommendation to the governor that bars should be
6   closed?
7   **A.**   We had data from outside sources, from other countries
8   that have faced the COVID epidemic that found similar
9   associations specific to bars.  The reason, again, is the
10  social behavior and the risks unique to bars: the social nature
11  of going to a bar to circulate, something that's not usually
12  done at a restaurant, meaning going to meet other people and
13  include higher numbers of contact; the fact that if you are
14  drinking a drink or drinks all night, very likely you will not
15  wear a mask at all, and you will slowly drink your beverage
16  throughout the night; and that many bars feature very loud
17  situations, because of talking or because of music, causing
18  people to lean in close to each other, which means that there's
19  a higher risk of spread because of that proximity and again
20  without masks.
21  **Q.**   Dr. Billioux, is it fair to say that you do not have that
22  same level of concern about the types of activities that happen
23  at a restaurant where people are seated for a meal?
24  **A.**   Yes, that's true.  We do not have that same concern for
25  restaurants.

ALEXANDER BILLIOUX - DIRECT

1   **Q.**   That includes you do not have that same level of concern
2   if someone is seated at a bar area, is there with either
3   themselves or a party but only for the purpose of a meal
4   consumption; where I'm seated at a bar space, but I'm not there
5   to drink, I'm there to have a meal as part of a spacing for
6   seating in a restaurant?
7   **A.**   Yes, that's correct.  It's activity dependent.
8   **Q.**   Which is why you believe that this guidance that you were
9   involved with developing, that you are okay with bar areas of
10  restaurants being served as seating for --
11          **MR. FAIRCLOTH:**  Objection.  Leading, Your Honor, very
12  leading.
13          **MR. BLOCK:**  -- restaurants?
14              He is an expert, Your Honor.
15          **THE COURT:**  Well, look, don't lead him.  Let's not
16  dance on the head of a pin.  I'm going to let him answer the
17  question.
18          **MR. BLOCK:**  I'll ask it a different way, Your Honor.
19  BY MR. BLOCK:
20  **Q.**   You believe that the activity that is in front of us here
21  where bar areas are being used for seating/serving purposes
22  only, not allow for social gatherings, that they must serve
23  food items, that that activity described right there is
24  different from what was occurring in bars in particular?
25  **A.**   Yes.

ALEXANDER BILLIOUX - DIRECT

 1   **Q.**  You believe that this activity, in your public health
 2   opinion, the activity we see described here, is safer, correct?
 3   **A.**  Yes.
 4          **THE COURT:**  Well, was that the basis of the
 5   governor's proclamations?
 6          **THE WITNESS:**  Yes.  Again, Your Honor, my
 7   understanding was he wanted to be the least restrictive
 8   possible, thus allowing these businesses to remain open, if
 9   they would operate in a safer frame, in this case as
10   restaurants, not as bars, since that's an unsafe context.
11          **THE COURT:**  Who was that?  I don't know who was
12   speaking.
13          **THE WITNESS:**  Sorry, Your Honor.  That was Alex
14   Billioux, Dr. Billioux.
15          **THE COURT:**  All right.  Go ahead.
16              Anything else, Counsel?  You are getting close
17   to time.
18          **MR. BLOCK:**  I'm wrapping up, Your Honor.
19   BY MR. BLOCK:
20   **Q.**  Dr. Billioux, Judge Feldman asked the very question that I
21   was going to ask, which is:  All of the things we are talking
22   about right now, including the distinction between bars and how
23   bar spaces in restaurants would operate, all of these were
24   discussed with the governor prior to the declaration, were they
25   not?

ALEXANDER BILLIOUX - DIRECT

1  **A.**   Yes.

2  **Q.**   Dr. Billioux, your recommendation to the governor prior to

3  the issuance of 89 JBE 2020, which amongst other things closed

4  bars for on premises consumption, that was to what?  What was

5  the purpose of that recommendation?

6  **A.**   The goal was to stop the increasing cases that we were

7  seeing, the growing number of cases we were seeing across the

8  state to once again gain control over the COVID epidemic.

9  **Q.**   Dr. Billioux, do you believe at this point in time that

10  you have seen some success from the mitigation measures taken

11  in that order?

12  **A.**   Yes, I do.

13  **Q.**   Now, Dr. Billioux, I have one last question.  What

14  concerns do you have if this order, as it relates to bars, is

15  voided, is overturned, and bars are allowed to reopen?  What

16  are your particular concerns?

17  **A.**   My concern is that we would once again rapidly see cases

18  increase.

19         **MR. FAIRCLOTH:**  Objection, Your Honor.  I'm not sure

20  his personal concerns are relevant.

21         **THE COURT:**  Well, he has been qualified by you as an

22  expert, so I'm going to permit him to answer the question.  I'm

23  interested in the answer myself.

24         **THE WITNESS:**  Thank you, Your Honor.  I think that

25  our concern would be that cases would rapidly increase again, I

ALEXANDER BILLIOUX - DIRECT

1   think, for a number of reasons.

2           One, especially -- today is Friday.  One could

3   expect that news that you are able to go back out to a bar

4   would result in many people going back out to a bar.  The

5   difference now between where we were then and where we are now

6   is that people are now -- or rather universities are now

7   reopening.  People are back on campus, specifically younger age

8   groups that we know have more COVID circulating and are at a

9   higher risk and more likely to go to a bar.  I think in all

10  likelihood we would see significant new spread begin again.

11          And most importantly and the way that I

12  understand the governor to make his decisions, that would

13  likely lead to further use of health care services, and we are

14  still critically low on available ICU beds and beds in many

15  parts of the state.

16  BY MR. BLOCK:

17  Q.   Dr. Billioux, that was going to be my last question, but I

18  just want to finish up with what you just said.

19          Are we out of the woods right now?  There were a lot

20  of questions about we are doing better, and we are, but are we

21  out of the woods for your concerns right now?

22  A.   Not at all.  I'm still very concerned.  We are seeing

23  numbers that are still high even though they are lower than

24  before these orders.  Frankly, there's no reason to believe

25  that we wouldn't go right back to that trajectory, if not

ALEXANDER BILLIOUX - CROSS

1    higher, if those orders are removed.

2            **MR. BLOCK:**  That's all the questions I have,

3    Your Honor.

4            **THE COURT:**  Thank you, Counsel.

5                Before we go back to Mr. Faircloth, I'm going to

6    permit all of the exhibits that have been used thus far to be

7    admitted into the record.  I'm going to have them admitted as

8    the Court's exhibits.  That will take care of any concerns that

9    counsel on each side might have.

10               Mr. Faircloth, do you have anything else?

11           **MR. FAIRCLOTH:**  Your Honor, very narrowly to new

12   material that he talked about just now.  I will keep it brief.

13           **THE COURT:**  Go ahead.

14                         **CROSS-EXAMINATION**

15   BY MR. FAIRCLOTH:

16   **Q.**   Dr. Billioux, you talked about the White House

17   recommendations.  The White House recommended closing bars.  Is

18   that your testimony?

19   **A.**   They did.

20   **Q.**   They didn't tell you which bars to close, though, did

21   they?

22   **A.**   They said bars and nightclubs.

23   **Q.**   You did not close all bars, did you?

24   **A.**   We did not close all bars.  We tried to stop bar activity.

25   **Q.**   So you did or you did not?  So you did not follow the

ALEXANDER BILLIOUX - CROSS

1    White House recommendation literally.  You made decisions as to

2    which bars you think warranted closure.  Correct?

3            **MR. BLOCK:**  Your Honor, I'm going to object as

4    argumentative.

5            **THE COURT:**  Overruled.  Overruled.

6            **THE WITNESS:**  So I will note that the White House

7    recommendation came after our presentations to the governor and

8    the governor's decisions on the order and the governor enacting

9    the orders.

10   BY MR. FAIRCLOTH:

11   **Q.**   Did the White House give you any advice on how to draw

12   distinctions between bars to close?

13   **A.**   They did not.

14   **Q.**   Now, a moment ago you were asked some questions about the

15   guidance document, the one from the fire marshal.  It's

16   actually Defense Exhibit 45.  We are going to put it back up.

17   Just a moment.

18           This is the document you referred to a moment ago.  I

19   want to go down to the language you were just explaining that

20   says service in bar areas must include food items.  You cited

21   that, as I understand your testimony a moment ago, as the basis

22   for the distinction between the bars that you closed.  Is that

23   correct?

24   **A.**   Yeah, those two sentences together.

25   **Q.**   Do you know whether or not this guidance document has the

ALEXANDER BILLIOUX - CROSS

1   force of a law, one way or the other?

2   **A.**   I do not.

3   **Q.**   But you do know this guidance document was not promulgated

4   under the APA?  You do know that, don't you?

5   **A.**   I don't know that.

6   **Q.**   You were asked a question about Chili's, if Chili's is

7   operating.  Have you been to Chili's to see if they are

8   complying with this?

9   **A.**   I haven't, but again the state fire marshal, the

10  sanitarians, and the inspectors for ATC likely have been to

11  Chili's across the state.

12  **Q.**   The order itself, the governor's closure order, does not

13  draw this particular distinction between restaurants with bars

14  and restaurants without bars, does it, or between bars outside

15  restaurants and bars inside restaurants?  It does not draw that

16  distinction, does it?

17  **A.**   I believe that it does reference these documents, but I

18  don't believe that it explicitly draws that distinction.

19  **Q.**   You say "reference these documents," you mean it points to

20  the fire marshal's website, correct?

21  **A.**   And specifically these OpenSafely documents.  I think

22  that's the section we read earlier.

23  **Q.**   So the question, then, is whether or not these documents

24  provide a valid basis for that distinction.  Would you agree

25  that's the question?

ALEXANDER BILLIOUX - CROSS

1    **A.**   If that's the question you are asking me, I agree to that.

2    I don't have the expertise to answer that question.

3             **MR. FAIRCLOTH:**  Nothing further, Your Honor.

4             **THE COURT:**  Thank you very much.

5                  Thank you, Doctor.

6                  Is the doctor excused?

7             **MR. BLOCK:**  He is from the defense, Your Honor.

8             **MR. FAIRCLOTH:**  Yes, Your Honor.

9             **THE COURT:**  Anything else, Counsel?

10            **MR. FAIRCLOTH:**  Not with this witness, Your Honor,

11   but I do have a few more housekeeping matters.

12            **MR. GARNER:**  We have some too, Judge.

13            **THE COURT:**  Pardon?

14            **MR. GARNER:**  Jim Garner.  I have some housekeeping

15   matters too.

16            **THE COURT:**  Dr. Billioux, you are excused.

17                  Let's get to the housekeeping matters.  As I

18   indicated, all documents that were referenced will be admitted

19   into evidence.

20                  Go ahead, Mr. Faircloth.

21            **MR. FAIRCLOTH:**  Thank you, Your Honor.  Your Honor,

22   we had other exhibits, including affidavits.  I had another

23   witness on standby.  Under the circumstances I'm satisfied if

24   the Court will allow us to introduce those.  Because of time

25   constraints, I was trying to do as much as I could with the

1   limitations that we are faced with.

2          THE COURT:  I'll permit that.  There are a lot of

3   affidavits by bar owners, especially the amicus stuff, saying

4   that they would social distance and they would do what was

5   necessary.  I will permit all of that.

6          MR. FAIRCLOTH:  Before closing, I would make sure

7   that I offer -- and I hear the Court allowing -- the exhibits

8   that are referenced on our formal exhibit list.  With that I'll

9   rest, Your Honor.

10         THE COURT:  Absolutely.

11         MR. GARNER:  Your Honor, we want to do exactly the

12  same thing.  We offer, file, and introduce Exhibits 1 through

13  51 on our supplemental exhibit list.

14         THE COURT:  So ordered.

15             Anything else?

16         MR. FAIRCLOTH:  No, sir.

17         MR. GARNER:  No, sir.

18         THE COURT:  Counsel, I want to thank both sides.

19  You're a credit to our profession.  I am taking this matter

20  under submission.  I will try to get an opinion out as soon as

21  is reasonably possible.  I am aware of the constraints that

22  affect each side, so I will try to be as prompt and efficient

23  as I can be.

24         MR. GARNER:  Thank you, Your Honor.  It's always an

25  honor and privilege to be before you.

1          **THE COURT:**  Thank you very much.  Thank you, Counsel.

2    Court is adjourned.

3          (Proceedings adjourned.)

4                              * * *

5                          <u>**CERTIFICATE**</u>

6          I, Toni Doyle Tusa, CCR, FCRR, Official Court

7    Reporter for the United States District Court, Eastern District

8    of Louisiana, certify that the foregoing is a true and correct

9    transcript, to the best of my ability and understanding, from

10   the record of proceedings in the above-entitled matter.

11

12

13                              */s/ Toni Doyle Tusa*
                                 Toni Doyle Tusa, CCR, FCRR
14                               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25